*** Filed ***
12:48 PM, 14 Oct, 2025
U.S.D.C., Eastern District of New York



**Jean Jean**
**October 11, 2025**

**I have a document I printed at home to send that show some emails to me that I was able to print from the DOE**

Question-

- Can I ask for my DOE Emails?
- If they do not respond to see my file what should I do?

**I also had an issue getting employment verification for NYS Certification to get my B-2 Special Ed Certification which I was finally able to obtain.

On or about August 2021, I received numerous harassing emails on vaccination and if I did not get the vaccination I would be placed on LWOP. The emails were from the DOE and started as early as summer of 2021 and continued daily up until I was placed on LWOP 10/4/21, and after that as well.

During this time so much information was being put out, the arbitration agreement was confusing and unclear on what it ment, if we could get unemployment and medical if we resigned. The reason I signed (under duress) the agreement with special provision is because I was

expecting to get unemployment soon after that. It was over a year before I received unemployment, and my severance came late March 17, 2022. The resignations with provisions promised some security with income from unemployment but it never came.

On several occasions my principal spoke with me at the door of my room to discuss my vaccination status and said "you know you have to do it" (she is passed on now) I was also called into her office in September, to discuss my vaccination status along with the AP Ivana Reimer. In that meeting she also asked why I did not get the vaccine, and said "I don't know why I did a booster", I was extremely nervous in this meeting and did not have a union rep present.

After I was placed on LWOP in October I was called several times asking what my plans were about vaccination. I said I was taking the time to decide. I was told " you are getting another job from what we here, and you know you can't work while you're on LWOP" this was prior to 10/18 when I resigned under duress from all this harrassment. From October 4-October 18 the school administration called me at least once a week. Along with the numerous emails reminding me I was not vaccinated.

During this time I was extremely confused, stressed and anxious. I was not thinking clearly. I was getting information from so many sources, harassed by the DOE with emails and my admin with phone calls. I was

completely unable to think clearly. I was not able to retrieve all my email correspondence as I was not warned it would be shut down to retrieve any important documents. I had the highest special education seniority in the building. I had 17 years teaching in the same school. I never was guided to file any grievance, I was not given a 3020A hearing. I was not able to reach my union, ask questions in any town hall, or anyone from the TRS for advice during the two weeks while I was on LWOP. I was exhausted mentally.

During this time I was worried how I would pay my bills, how would I be able to maintain my medical insurance and make ends meet. I was confused, worried, anxious about all of this that was happening. I am the head of household. I have been a single parent for 14 years, and had no one else to count on for financial support. I was worried about my financial future. I sought out therapy and attended weekly sessions for over several months to help deal with my anxiety and stress.

At the time of my resignation I attempted several times to submit the document, OP 44, first a mailed hard copy to my principal which was to be signed and returned to me to upload, that process was then changed and not accepted and an ADOBE program was implemented via the DOE online portal. With this new format I was unable to indicate anything in the fields except the information requested so I

could not hand write on the form or type in under duress, in any field. Also, the portal was rejecting not just my form but many others for discrepancies with print and font. There was no tutorial on how to fill out the OP44 form. The form was rejected from October to almost the end of November.

Below is a list of fall out from my severance from the DOE

## Losses from Job Financial

Salary
401 k contributions
TDA taxed me on loans and reported to IRS no have 14K debt to IRS
Had to take money out from investments
Credit card debt could not pay
Credit score went down
Per session opportunities lost
Incurred debt
Loans from family
Salary Steps lost
Seniority lost
Pension Credit lost
Pension 55/25 contribution program/QPP lost
Problem Code kept me from gainful employment

- Health Benefits.
- Dental and Vision Coverage.
- Prescription Drug Program.
- 401(k) and 457(k) Retirement Savings Programs.
- Flexible Spending Program.
- Training and Professional Development

## Affiliation and memberships no longer could keep

UFT
AFT
NYSUT

Discount websitesPlum Benefits

Medical Coverage

Catastrophic Coverage offers

CLTE hours for free

Dental Coverage

Mental Health Coverage

After one year on DOE Medical lost my personal therapist

Discounts at teacher stores/tax exempt on teaching materials

DOE Email shut down on or about 10/4/21

No unemployment

Payout for CAR Days took several months

Counted on that to maintain my bills

**I have a document I printed at home to send that show some emails to me that I was able to print from the DOE**

Question-

- Can I ask for my DOE Emails?
- If they do not respond to see my file what should I do?

**I also had an issue getting employment verification for NYS Certification to get my B-2 Special Ed Certification which I was finally able to obtain.

On or about August 2021, I received numerous harassing emails on vaccination and if I did not get the vaccination I would be placed on LWOP. The emails were from the DOE and  started as early as summer of 2021 and continued daily up until I was placed on LWOP 10/4/21, and after that as well.

During this time so much information was being put out, the arbitration agreement was confusing and unclear on what it ment, if we could get unemployment and medical if we resigned. The reason I signed (under duress) the agreement with special provision is because I was expecting to get unemployment soon after that. It was over a year before I received unemployment, and my severance came late March 17, 2022. The resignations with provisions promised some security with income from unemployment but it never came.

On several occasions my principal spoke with me at the door of my room to discuss my vaccination status and said "you know you have to do it" (she is passed on now) I was also called into her office in September, to discuss my vaccination status along with the AP Ivana Reimer. In that meeting she also asked why I did not get the vaccine, and said "I don't know why I did a booster", I was extremely nervous in this meeting and did not have a union rep present.

After I was placed on LWOP in October I was called several times asking what my plans were about vaccination. I said I was taking the time to decide. I was told " you are getting another job from what we here, and you know you can't work while you're on LWOP" this was prior to 10/18 when I resigned under duress from all this harrassment. From October 4-October 18 the school administration called me at least once a week. Along with the numerous emails reminding me I was not vaccinated.

During this time I was extremely confused, stressed and anxious. I was not thinking clearly. I was getting information from so many sources, harassed by the DOE with emails and my admin with phone calls. I was completely unable to think clearly. I was not able to retrieve all my email correspondence as I was not warned it would be shut down to retrieve any important documents. I had the highest special education seniority in the building. I had

17 years teaching in the same school. I never was guided to file any grievance, I was not given a 3020A hearing. I was not able to reach my union, ask questions in any town hall, or anyone from the TRS for advice during the two weeks while I was on LWOP. I was exhausted mentally.

During this time I was worried how I would pay my bills, how would I be able to maintain my medical insurance and make ends meet. I was confused, worried, anxious about all of this that was happening. I am the head of household. I have been a single parent for 14 years, and had no one else to count on for financial support. I was worried about my financial future. I sought out therapy and attended weekly sessions for over several months to help deal with my anxiety and stress.

At the time of my resignation I attempted several times to submit the document, OP 44, first a mailed hard copy to my principal which was to be signed and returned to me to upload, that process was then changed and not accepted and an ADOBE program was implemented  via the DOE online portal. With this new format I was unable to indicate anything in the fields except the information requested so I could not hand write on the form or type in under duress, in any field. Also, the portal was rejecting not just my form but many others for discrepancies with print and font. There was no tutorial on how to fill out the OP44

form. The form was rejected from October to almost the end of November.
Below is a list of fall out from my severance from the DOE

## Losses from Job Financial

Salary
401 k contributions
TDA taxed me on loans and  reported to IRS no have 14K debt to IRS
Had to take money out from investments
Credit card debt could not pay
Credit score went down
Per session opportunities lost
Incurred debt
Loans from family
Salary Steps lost
Seniority lost
Pension Credit lost
Pension 55/25 contribution program/QPP lost
Problem Code kept me from gainful employment

- Health Benefits.
- Dental and Vision Coverage.
- Prescription Drug Program.
- 401(k) and 457(k) Retirement Savings Programs.
- Flexible Spending Program.
- Training and Professional Development

## Affiliation and memberships no longer could keep

UFT
AFT
NYSUT
Discount websitesPlum Benefits
Medical Coverage
Catastrophic Coverage offers
CLTE hours for free
Dental Coverage
Mental Health Coverage

After one year on DOE Medical lost my personal therapist

Discounts at teacher stores/tax exempt on teaching materials

DOE Email shut down on or about 10/4/21

No unemployment

Payout for CAR Days took several months

Counted on that to maintain my bills



12421 Meredith Drive



Jean Jean <jeanejean71@gmail.com>

**(no subject)**
12 messages

Thu, Jan 19 at 9:22 AM

**Jean Jean** <jeanejean71@gmail.com>
To: Gigi Bouldin <gigi@knowledgeroad.org>

Since I am out of the DOE over 12 months it has been almost 15 why do I need the clearance ? Just wondering f that matters ?

Thu, Jan 19 at 9:42 A

**Gigi Bouldin** <gigi@knowledgeroad.org>
To: Jean Jean <jeanejean71@gmail.com>

Good Morning,

Our agency is funded by the DOE. We are not able to hire anyone without an approval from the DOE. When someone who has been out of the DOE for over 12 months does not get approved, they do not inform us of the reason why. All w have is the OPI email you have to contact as well.

I'm not sure what their reasons are regarding your approval but unfortunately we are not able to move forward with employment until we receive correspondence from the DOE stating you are approved.

Thanks kindly,

On Thu, Jan 19, 2023 at 8:22 AM Jean Jean <jeanejean71@gmail.com> wrote:
Since I am out of the DOE over 12 months it has been almost 15 why do I need the clearance ? Just wondering f tha matters ?

--



**Gigi Bouldin**
**Director of Recruitment | Knowledge Road**

Phone - 718.540.8224
Calendar: calendly.com/gigibouldin
gigi@knowledgeroad.org

www.knowledgeroad.org



IMPORTANT: The contents of this email and any attachments are confidential. They are intended for the named recipient(s) only. If you have received this email by mistake, please notify the sender immediately and do not disclose the contents to anyone or make copies thereof.

**Jean Jean** <jeanejean71@gmail.com>
To: Gigi Bouldin <gigi@knowledgeroad.org>

Thu, Jan 19 a

Ok I understand I thought if I was out over 15 months it wouldn't be needed to be cleared I did email the doe bu course it will take forever to get through but I will be persistent since I am really looking forward to working wi agency.
[Quoted text hidden]

 **Gmail**

**Jean Jean <jeanejean71@gmail.com>**

---

## Re: Hi I did not receive the form yet could you indicate what the email would be to search the spam folder thanks also can you mail it as well?

3 messages

---

**Venekas Rita** <RVeneka@schools.nyc.gov>
To: Jean Jean <jeanejean71@gmail.com>

Mon, Jan 16, 2023 at 7:51 AM

Good morning

Your working status remains ineligible in PETS. I don't have access to the problem code to assist you with the clearance.

Please reach out to OPI to request assistance for clearance.

OPIinfo@schools.nyc.gov

**Rita Venekas, PAA**
**Office of Related Services**
**Email: rveneka@schools.nyc.gov**

"It is during our darkest moments that we must focus to see the light"

Aristotle

---

**From:** Jean Jean <jeanejean71@gmail.com>
**Sent:** Thursday, January 12, 2023 7:50 AM
**To:** Venekas Rita <RVeneka@schools.nyc.gov>
**Subject:** Re: Hi I did not receive the form yet could you indicate what the email would be to search the spam folder thanks also can you mail it as well?

Hi I did receive it later after that email and I filled it all out thanks so much sorry for the trouble.

On Thu, Jan 12, 2023 at 7:49 AM Venekas Rita <RVeneka@schools.nyc.gov> wrote:

Good morning

The nomination was sent on January 1th. You should receive it within 24 hours

Please search for the DOE email and open the link to complete it/answer all questions.

**Rita Venekas, PAA**
**Office of Related Services**
**Email: rveneka@schools.nyc.gov**
"It is during our darkest moments that we must focus to see the light"
Aristotle

---

**From:** Jean Jean <jeanejean71@gmail.com>
**Sent:** Tuesday, January 10, 2023 9:39 AM
**To:** Venekas Rita <RVeneka@schools.nyc.gov>
**Subject:** Hi I did not receive the form yet could you indicate what the email would be to search the spam folder thanks also can you mail it as well?

---

**Jean Jean** <jeanejean71@gmail.com>
To: Venekas Rita <RVeneka@schools.nyc.gov>

Mon, Jan 16, 2023 at 5:58 PM

I have a feeling it's because I resigned last year so I will follow up with them.

[Quoted text hidden]

---

**Jean Jean** <jeanejean71@gmail.com>                                    Mon, Jan 16, 2023 at 5:59 PM
To: Venekas Rita <RVeneka@schools.nyc.gov>

Also what does PETS stand for when I email them

[Quoted text hidden]

 Gmail

**Jean Jean <jeanejean71@gmail.com>**

# Release of name
4 messages

---

**Jean Jean** <jeanejean71@gmail.com>                    Tue, Jan 31, 2023 at 11:38 AM
To: Venekas Rita <rveneka@schools.nyc.gov>

I have been trying for two weeks to get the problem code lifted so I can work with the agency. Please let me know
what else I can do ?

---

**Venekas Rita** <RVeneka@schools.nyc.gov>                    Thu, Feb 2, 2023 at 8:26 AM
To: Jean Jean <jeanejean71@gmail.com>

Good morning

I don't have access to the problem code/it is confidential information and is handled only by OPI.  Due to
a very high volume of inquiries, it will take longer than usual for OPI to respond to your email.  Please do
not send multiple emails. Your email will be addressed by OPI.

 Thank you for your cooperation

**Rita Venekas, PAA**
**Office of Related Services**
**Email: rveneka@schools.nyc.gov**
"It is during our darkest moments that we must focus to see the light"
Aristotle

---

**From:** Jean Jean <jeanejean71@gmail.com>
**Sent:** Tuesday, January 31, 2023 11:38 AM
**To:** Venekas Rita <RVeneka@schools.nyc.gov>
**Subject:** Release of name

[Quoted text hidden]

---

**Jean Jean** <jeanejean71@gmail.com>                    Thu, Feb 2, 2023 at 8:31 AM
To: Venekas Rita <RVeneka@schools.nyc.gov>

Ok, thank you. It's just frustrating do they have a mailing address what does OPL a stand for or is it OPI
[Quoted text hidden]

---

**Venekas Rita** <RVeneka@schools.nyc.gov>                    Thu, Feb 2, 2023 at 9:56 AM
To: Jean Jean <jeanejean71@gmail.com>

OPI
Office of Personnel Investigations

**Rita Venekas, PAA**
**Office of Related Services**
**Email: rveneka@schools.nyc.gov**
"It is during our darkest moments that we must focus to see the light"

Aristotle

**From:** Jean Jean <jeanejean71@gmail.com>
**Sent:** Thursday, February 2, 2023 8:31 AM
**To:** Venekas Rita <RVeneka@schools.nyc.gov>
**Subject:** Re: Release of name

[Quoted text hidden]

SCANNED ON 7/16/2010

# SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: __ALICE SCHLESINGER__                    PART **IA PART 16**
_____
                 *Justice*

Philomena Brennan

INDEX NO. __112977/09__

MOTION DATE _____

- v -

MOTION SEQ. NO. __001__

NYC Dept of Education

MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits _____ | _____ |

**Cross-Motion:** ☒ Yes ☐ No

Upon the foregoing papers, it is ordered that this ~~motion~~ Article 78 proceeding and respondent's cross-motion to dismiss are determined in accordance with the accompanying memorandum decision.

**UNFILED JUDGMENT**
This Judgment has not been entered by the County Clerk and notice of entry cannot be served based hereon. To obtain entry, counsel or authorized representative must appear in person at the Judgment Clerk's Desk (Room 141B).

JUL 13 2010

Dated: __July 13, 2010__

*Alice Schlesinger*
ALICE SCHLESINGER J.S.C.

Check one: ☒ FINAL DISPOSITION ☐ NON-FINAL DISPOSITION

Check if appropriate: ☐ DO NOT POST ☐ REFERENCE

☐ SUBMIT ORDER/JUDG. ☐ SETTLE ORDER /JUDG.

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------------X

In the Matter of the Application of

PHILOMENA BRENNAN,

Petitioner,

Index No. 112977/09
Motion Seq. No. 001

For An Order and Judgment Pursuant to Article 78 of
the Civil Practice Law and Rules,

-against-

NEW YORK CITY DEPARTMENT OF EDUCATION,

Respondent.

-------------------------------------------------------------------------X

**SCHLESINGER, J.:**

Petitioner Philomena Brennan, a tenured teacher, commenced this Article 78

proceeding against the New York City Department of Education (DOE) seeking to have her

name removed from the DOE's Ineligible/Inquiry List, as the basis for the listing was a

criminal complaint against her that was long ago dismissed. In addition, Ms. Brennan seeks

to compel the DOE to allow her to withdraw the resignation she submitted when the

criminal charges were first filed. The DOE has moved to dismiss, contending that

petitioner's challenge to the listing is time-barred. With respect to the resignation issue, the

DOE has sought dismissal for failure to state a cause of action, alleging that no

administrative decision exists on that issue for this Court to review and that Ms. Brennan

must pursue contractual remedies under her collective bargaining agreement before

coming to court.

The background facts are set forth in this Court's May 12, 2010 interim decision and

will be briefly reviewed here.

At the time in question, the spring of 2006, Ms. Brennan was working as a full-time teacher at Frederick Douglas Academy in Brooklyn. Toward the end of the school year, the principal Tamika Matheson advised Ms. Brennan that she was giving her an unsatisfactory rating, the first she had ever received. Following their discussion, Ms. Brennan formally resigned from her teaching position, but she thereafter did some substitute teaching.

Some years later, having decided to take steps to withdraw her resignation, Ms. Brennan returned to the school on January 30, 2009 to speak with the principal. According to Ms. Brennan, she saw the principal and was escorted to her office and told to wait. About ten minutes later she was arrested, handcuffed and charged with the misdemeanor of trespass and the violation of harassment. In accordance with the rules, Ms. Brennan promptly reported the arrest to the DOE.

Due to the arrest, Ms. Brennan was placed on the DOE's Ineligible/Inquiry List, making her ineligible for rehire or for a teaching assignment. Six months later, on June 10, 2009, all criminal charges were dismissed against Ms. Brennan. Within a day or so, Ms. Brennan formally requested that the DOE remove her name from the Ineligible/Inquiry List based on proof of that dismissal, but despite some follow-up meetings, she received no response to her request. She commenced this proceeding in September 2009; as of May 12, 2010 when oral argument was held, Ms. Brennan had still not received a decision on her request to be removed from the List. Nor had she been able to withdraw her resignation.

Following oral argument, this Court issued an interim decision dated May 12 denying the DOE's motion to dismiss the proceeding as time-barred. The Court further directed the

2

DOE to promptly determine Ms. Brennan's request to have her name removed from the Ineligible/Inquiry list and to appear again on July 7, 2010 for further argument.

On July 7, counsel for the DOE appeared with a copy of an undated letter addressed to Ms. Brennan and signed by Santiago Taveras, IA Deputy Chancellor Teaching and Learning (as designee for Joel I. Klein, Chancellor). The letter is brief, consisting of only two sentences. In it, Deputy Chancellor Taveras indicates that he has carefully considered the matter and "determined to sustain the recommendation regarding removal of [Ms. Brennan's] name from the Invalid/Inquiry List."

While the letter does not include an effective date, it can only logically be construed as having an effective date of June 11, 2009, the date when Ms. Brennan applied to have her name removed from the Ineligible/Inquiry List based on the dismissal of the criminal charges. As no legal basis existed for keeping Ms. Brennan's name on the List after that point, the DOE should have acted promptly to remove the name so Ms. Brennan could be considered for rehire as a substitute teacher.

Somewhat more complex is Ms. Brennan's request for relief based on her failed attempts to withdraw her resignation as a full-time teacher. Ms. Brennan was not eligible to withdraw her resignation until her name was removed from the Ineligible/Inquiry List. Now that that has been accomplished, she may apply to withdraw her resignation by following the set DOE procedures, whatever they may be. As respondent correctly argues, no DOE decision exists determining that issue for this Court to review in this proceeding. Therefore, that part of petitioner's request for relief is premature, and the DOE's cross-motion to dismiss that claim for failure to state a cause of action is granted. As no other issues are extant, no further submissions or appearances by either party are necessary.

3

Accordingly, it is hereby

ORDERED that respondent's cross-motion to dismiss this proceeding as time-barred is denied in accordance with this Court's May 12, 2010 interim decision; and it is further

ADJUDGED that the petition is granted insofar as it requests the removal of the name of Philomena Brennan from the Ineligible/Inquiry List maintained by respondent New York City Department of Education, effective June 11, 2009; and it is further

ORDERED that respondent's cross-motion to dismiss petitioner's claim regarding the withdrawal of her resignation as a teacher is granted, and that claim is dismissed without prejudice and without costs or disbursements to either party.

This constitutes the final decision, order and judgment of this Court.

Dated: July 13, 2010

**JUL 13 2010**

J.S.C.
**ALICE SCHLESINGER**

**UNFILED JUDGMENT**
This judgment has not been entered by the County Clerk and notice of entry cannot be served based hereon. To obtain entry, counsel or authorized representative must appear in person at the Judgment Clerk's Desk (Room 141B).

4

| STATE OF NEW YORK EDUCATION DEPARTMENT |
|---|
| |
| |
| In the Matter of the Arbitration of Education Law § 3020 (a) Proceedings |
| |
| Elmira City School District, Employer, |
| -against- |
| Theresa Usack Armstrong, Respondent |
| |
| |



Subject: SED File # 6,371

Nancy Faircloth Eischen, Arbitrator

<u>Appearances</u>

For the Employer:

                    SAYLES & EVANS. LLP
                    By:
                       James Young, Esq.

For the Respondent:

                    SCHOOL ADMINISTRATORS ASSOCIATION OF NEW YORK STATE
                    By:
                       Arthur Scheuremann, Esq.
                       Robert Fullem, Esq.

# PROCEEDINGS

The NY State Education Department designated me hear this case and issue an Opinion and Award, under the terms of Section 3020 (a) of the Education Law. Hearings were held on September 2 and 3, 2009, November 5 and 6, 2009 and January 28 and 29, 2010, in Elmira, N. Y. Both Parties were represented by Counsel and afforded full opportunity to present testimony subject documentary evidence, testimony subject to cross-examination and oral argument in support of their positions. Ms. Theresa Usack Armstrong (hereinafter "Usack" or "Respondent") was present throughout the proceedings and testified as a witness in her own behalf. Following receipt of the transcribed stenographic record, Counsel for the Parties submitted and exchanged post-hearing briefs, whereupon the record was declared closed.

## ISSUES

1) Did the Elmira School District have just cause to suspend the Grievant, Theresa Usack Armstrong?

2) If not, what shall be the remedy?

## PERTINENT STATUTORY PROVISIONS

### NEW YORK STATE EDUCATION LAW

**Section 3012**

[Teachers] ... shall hold their respective positions during good behavior and efficient and competent service, and shall not be removed except for any of the following causes, after a hearing, as provided by section three thousand twenty - a of such law: (a) insubordination, immoral character or conduct unbecoming a teacher, (b) inefficiency, incompetency, physical or mental disability, or neglect of duty-, (c) failure to maintain certification.

***

2

**Section 3 0 2 0**

1. No person enjoying the benefits of tenure shall be disciplined or removed during a term of employment except for just cause and in accordance with the procedures specified in section three thousand twenty-a of this article.

**Section 3 0 2 0 - a**

*4. Post hearing procedures.* (a) The hearing officer shall render a written decision within thirty days of the close of the hearing … , and shall forthwith forward a copy thereof to the commissioner of education who shall immediately forward copies of the decision to the employee and to the clerk or secretary of the employing board. The written decision shall include the hearing officer's findings of fact on each charge, his or her conclusions with regard to each charge based on said findings and shall state what penalty or other action, if any, shall be taken by the employing board. At the request of the employee, in determining what, if any, penalty or other action shall be imposed, the hearing officer shall consider the extent to which the employing board made efforts toward correcting the behavior of the employee which resulted in charges being brought under this section through means including but not limited to: remediation, peer intervention or an employee assistance plan. In those cases where a penalty is imposed, such penalty may be a written reprimand, a fine, suspension for a fixed time without pay, or dismissal. In addition to or in lieu of the aforementioned penalties, the hearing officer, where he or she deems appropriate, may impose upon the employee remedial action including but not limited to leaves of absence with or without pay, continuing education and/or study, a requirement that the employee seek counseling or medical treatment or that the employee engage in any other remedial or combination of remedial actions.

## BACKGROUND

Theresa Usack Armstrong, formerly known as Theresa Armstrong ("Ms. Usack" or "Respondent"), entered employment with the Elmira New York School District, ("District") in March 2002. Her initial probationary appointment was as an Assistant Principal position at Southside High School ("SHS"), under Principal Lisa Kelly. Principal Kelly and Assistant Principal Usack were assigned at SHS, and later Ernie Davis Middle School ("EDMS"), as part of a special team of professional educators charged by the State Education Department ("SDE") with implementing Commissioner of Education directives to develop a corrective action plan for the District's chronically underperforming District schools. Such corrective action plans for SINI-listed schools

can involve school reorganization, staff removal and re-assignment or closing the school. To no one's great surprise, such corrective plan work can often generate a push back response of procrastination, resistance and hostility, including both covert and open political action, by affected teachers, parents and other community members.

Based on her performance of this difficult work during the 8 months following her probationary appointment, the District's then Board of Education promoted Ms. Usack to Acting Principal of SHS, when Principal Kelly took a medical leave of absence. To enable Usack to continue the politically controversial remediation work unimpeded, the Board at that time also granted Ms. Usack early tenure; followed soon thereafter, by a merit pay increase. Based upon continued superior job performance, from the time of her initial appointment in 2002 to the present, Ms. Usack has received consistently positive performance evaluations from her professional educator supervisors.

At the request of then Superintendent Bryant, Ms. Kelly agreed to implement remedial corrective action at the still under-performing EDMS, on condition that the District also assign Ms. Usack to the remediation team. Thus, in the 2005-2006 school year, Superintendent Bryant's administrative team at EDMS consisted of Principal Lisa Kelly, Assistant Principal Theresa Usack and Assistant Principal Mack Knight. At that time, after 5 consecutive years on the SINI list, EDMS had been placed on the SED's list of "School Under Registration Review" ("SURR"). In the performance of corrective action plan implementation duties, Ms. Usack and the rest of the team met predictable resistance from affected EDMS teachers and parents. One of the EDMS teachers who expressed and displayed open animosity to Assistant Principal Usack, in particular, was Ms. Ginger Woolever; a teacher with whom Usack previously had worked in another school district.

The charges under arbitral review arose out of an incident during a field trip by the 8th grade class of Ernie Davis Middle School ("EDMS"), on April 7, 2006. EDMS teachers Ginger Woolever and Jeremy Sager planned and directed that excursion. They had originally set up a day trip to a nearby amusement park for most of the class, which excluded certain students they deemed to have "discipline problems". After Principal Kelly disapproved that plan, a more educational trip to Washington, D.C. was arranged, to which the entire 8th grade class, approximately two hundred (200) students, was invited.

Assistant Principals Knight and Usack were designated to accompany Ms. Woolever on that trip and subsequently asked to serve, along with teachers and volunteer parents, as "chaperones". When the two assistant principals were first asked to participate, neither were assigned students to supervise. However, approximately one week prior to the trip, Organizer G. Woolever informed Principal Kelly that there were "certain" students that "no one wants to supervise". At that time, Ms. Kelly asked Knight and Usack each to take on a group of those students for supervision throughout the trip.

Specifically, Ms. Usack was assigned students SH, PD, RD and CG, all described by Principal Kelly as "somewhat troubled girls" with whom Ms. Usack had "good rapport". For his part, Mr. Knight was assigned a group of five (5) boys, among them student IH, whose presence is particularly pertinent to one of the the incidents giving rise to the charges against Usack. Finally, Elmira Police Officer ("PO") Johnson, described by Ms. Woolever as the "School Resource Officer" assigned to EDMS, also was on the trip. He did not directly supervise any of the student participants, but rather was asked to attend in an "administrative" capacity.

5

On the evening of April 3, 2006, four days before departure, at a meeting with parents to which Assistant Principals Knight and Usack were not invited, Woolever presented the set of *ad hoc* instructions she had worked up for the trip. As of April 2006, there was neither a District policy nor standardized rules relating to the conduct of class trips. As noted, below, central office administrators pointed out the policy void surrounding the Washington, D.C. trip when they tried, unsuccessfully, to dissuade the then Board of Education from pursuing the instant charges against Ms. Usack. That Board did later articulate some supervisory standards of conduct in a new class trip policy enacted after the fact, which Superintendent Bryant distributed in a subsequent email notice to staff and principals advising them of the new policy.

On April 4, 2006, Woolever distributed her instructions for the upcoming trip to participants, including Knight and Usack, as an email attachment she labeled "DC for Dummies", including: "Students are expected to stay with their chaperones at all times [and] "students and chaperones need to be back on the bus (parked at the Lincoln Monument) by 7:55 PM. We leave at 8:00 PM sharp." Of note, all of the chaperones were also instructed to exchange cell phone numbers with one another, to "be available at all times" throughout the trip and to "call Johnson, Sager or Woolever if you have any problems".

The record demonstrates that almost nothing went right or according to plan on that April 7, 2007 trip from Elmira to Washington, D.C. The five buses from "Covered Wagon Tours" were about 15 minutes late for the 3:15 AM scheduled departure. When the group did get on the road, no preorder or prepay arrangements had been made for the planned breakfast stop for the 244 participants. As a result of this and other delays, the busses did not arrive in Washington until 11:30 AM; more than two (2) hours behind

schedule. That late arrival necessitated cancellation of the planned visit to the Capital Building and Congressional offices. According to parent/chaperones Ms. Nancy Wallace and Mr. Randy Zigenhagen, the trip immediately became "even more chaotic"; with the groups chaperones left "on our own" for the duration of the day.

Following the aborted visit to the Capital, the various dispersed EDMS groups toured museums and ate lunch before reassembling at 2:30 PM for the final scheduled stop: a guided instructional tour of the Holocaust Museum. After a dinner meal at the Reagan Center, they dispersed again for a "Walking Tour of the Monuments along the Mall". Chaperones were instructed by Woolever to reassemble the groups at the circle at the base of the Lincoln Memorial "at 7:55 PM for an 8 PM departure". Due to the tardy 11:30 am arrival time at the Capital that morning, however, the promised busses did not arrive at that rendezvous location until close to 9:00 pm [1]

Several chaperoned groups were the last to have dinner at the Reagan Center and begin the trek down the National Mall to the Lincoln Memorial. Three of those groups left together: Assistant Principal Usack with four (4) female students, Assistant Principal Knight and his group five (5) boys and parent Nancy Wallace, with a group of five (5) students that included her daughter. Shortly after 7:15 PM, Mr. Knight and his group of "rambunctious boys", including student I.H., went on ahead. They arrived at the Lincoln Memorial several minutes ahead of the Usack/Wallace groups. Meanwhile, Usack/Wallace and their intermingled groups meandered toward the rendezvous point, stopping at various souvenir kiosks and taking pictures along the way.

---

[1]  During cross-examination at the hearing, Ms. Woolever conceded that the contract she signed with the bus company specified that the roundtrip bus drivers must have an uninterrupted 9-hour rest period between destination arrival time and return trip departure time under governing federal DOT regulations.

Shortly after the Knight group went ahead, eight of the nine girls in the merged groups, including Nancy Wallace's daughter, asked if they could also "walk on ahead" to see the Lincoln Memorial before they boarded the busses. (Student R.D. elected to remain with Usack). Given the unimpeded view of the well-illuminated pathway for the remaining distance to the Lincoln Memorial, Wallace and Usack granted their request; after again reminding the eight students to be at the bus assembly point promptly at Tssp.m.

Nancy Wallace testified that when she reached the circle at approximately 7:45 p.m., none of her students was in sight. She walked up the steps of the Lincoln Memorial to view the famous statue before returning to the circle, where she reunited with her daughter and the other four girls of her group.[2] When Ms. Usack arrived at the circle a few minutes later, with student RD, the other students in her group were not in sight. An EDMS student told Usack they had climbed the steps to have a look at the Lincoln Memorial. Usack walked to the top of the Lincoln Memorial expecting to find the three students, but CG, PD and SH were not there. Ms. Usack asked teachers and fellow chaperones, including Assistant Principal Mack Knight, if anyone had seen her students PD, SH and CG, but no one recalled having seen the errant group of girls on the circle.[3]

With student RD in tow, Usack set off on an unassisted search of the area around the Lincoln Memorial and retraced her steps down the National Mall to the Washington

---

[2]    Ms. Wallace testified that they then "huddled together for warmth" on the circle and waited "at least another hour" for the busses to arrive.

[3]    At that time, Mr. Knight was not aware that student IH, from his own group and students PD and SH, from Ms. Usack's group, had all disobeyed instructions to remain at the circle and wandered away together to a nearby park.

Monument, all without locating the wayward students. She had attempted to call trip organizers Sanger and Woolever and P.O. Johnson on their cell phone, but received no answer. Finally, Usack called parent chaperone Randy Zigenhagen· and asked him to "tell Johnson, Woolever or Sager to call 911". When Ms. Usack returned to the bus circle, she approached Officer Johnson and personally asked if he had yet made the requested 911 calls. It is undisputed that Johnson stated, in words or substance, that he had not done so and would not do so; asserting that he "had no jurisdiction in DC".[4] Taken aback by this dismissive reply, Usack made her way to a nearby a nearby Park Police kiosk to report that CG, PD and SH were "missing" and might have "run away".

While Usack was speaking with the police officer at the kiosk, PD and SH approached from the direction of the nearby park in the company of IH, the male student whose unauthorized absence from Knight's group had not yet been yet noticed. When Usack admonished them for wandering away from the rendezvous point, IH asserted falsely that Knight had given him permission to go to the park until the busses arrived. In fact, Knight had not granted such permission and did not even know that IH had left the area until Usack brought him back with PD and SH.[5] Student CG was not with the other three wandering students, nor was she at the bus circle when Usack returned with the IH, PD and SH. Usack asked group organizer Woolever if she had seen student CG, and Woolever asserted, erroneously, that CG was "already on the bus". Usack searched each of the five busses and called for her by name using the bus

---

4       At the hearing, Ms. Woolever identified Johnson as a friend of hers who had served as a personal reference when she was hired in the District.

5       Mr. Knight estimated that I.H., P.D., and S.H. were gone between 15 to 20 minutes, in total, and also corroborated Ms. Usack's testimony that all three of those students were returned to the departure point prior to the arrival of the busses.

microphone, however, student CG was nowhere to be found. Usack therefore returned to the nearest Park Police kiosk, with the intention of again asking for police assistance, but that kiosk was no longer manned.

When Usack trudged back to the bus line, EMDS teacher S. Dal$_{rym}$ple thrust a cell phone toward the Respondent, without revealing that CG's father was on the line. When Usack answered, CG's father angrily reported, in words or substance: "A police sergeant named Weis has my daughter. Are you going to turn those busses around and go back and get her?" Ms. Usack responded that she would follow up with Sergeant Weis, that the busses had not yet departed for Elmira and that she never would leave any student behind.

On cross examination, CG testified that Sergeant Weis had detained her at the Capital Hill Park Police Station, not because she was "lost", but to question her in connection with his investigation of reported rock-throwing activity by some youths she was with when he picked her up near the World War II Memorial. Sergeant Weis reported to Ms. Usack that CG was safely in his custody and that he would return the wayward EDMS student to Ms. Usack "after completing the necessary paperwork". Sergeant Weis also told Usack that he had picked up the missing student "in the opposite direction of the Lincoln Memorial; clearly not where she was supposed to be". Following that conversation with Sergeant Weis, Ms. Usack called Mr. G. back, reassured him that his daughter was safe and that she would be placed on her bus as soon as the Park Police completed requisite paperwork.

Next, Ms. Usack contacted EDMS Principal Lisa Kelly, to whom she spoken several times throughout the day, and updated her on the situation. Ms. Kelly directed Ms. Usack to stay behind with her bus to await CG's return and let the other busses go

on ahead under the supervision of Assistant Principal Knight. *As* Usack completed yet another call to CG's father to update him on the now delayed timetable, Woolever approached and asked: "What are we supposed to do?" The Respondent replied, "You are supposed to do what the administrator on duty, Mr. Knight, asks you to do". Shortly thereafter, Sergeant Weis delivered the errant student CG and all of the busses departed for Elmira where they arrived within minutes of one another.

Two days later, Principal Kelly contacted Superintendent Bryant at home, to give him an update about the trip, "in case he got any parent feedback". Ms. Kelly testified that when she told him CG had "disengaged from the group" but was located and returned home safe, he replied: "Good, that's all I need to know. There is nothing else to worry about." For his part, Superintendent Bryant testified: "The good news, as far as I was concerned, was that everybody came back safe and sound. So, we thought we would process it and take what we learned from it and move forward. Certainly, neither Lisa (Kelly) nor I thought any discipline was warranted, or appropriate in the circumstances".

However, Superintendent Bryant testified, "some" members of the Elmira School Board, as well as "certain very vocal" members of the community, were not satisfied with those conclusions. Specifically, Superintendent Bryant recalled: "I had talked with (Board President) Mike Crimmins, who told me that he was getting 'a lot of letters and e-mails about the trip'. So we decided to do a full investigation, which (School District attorney) John Ryan conducted. Concerning that investigation, Ms Usack testified: "In addition to the written narrative I provided, attorney John Ryan interviewed me on three occasions. I never had representation, nor was I ever told that whatever I said could be used against me in formal discipline". However, by the end of April 2007, the

Respondent learned that the "community" was pressuring the District's administration to "bring charges" against her.

In that regard, former Superintendent Bryant testified: "Given the uproar over what happened, I thought people would be appeased with 'some' discipline. So I suggested, to the Board, that perhaps a counseling memo would be appropriate. Because, really, given the circumstances, as I understood them . . . the young lady in question had met someone on the Internet and planned to 'leave' all along. I also got some information that some other chaperones on the trip had actually seen the young lady, going in the wrong direction, and made no attempt to stop her. You know, it seemed not to be a negligent act, but rather it was middle school kids, and things happen".

The Superintendent went on to state: "Part of my job as superintendent is to both be fair to staff and represent the Board. So at my request, John (Ryan) searched for similar types of cases. One of our own Board members shared that he supervised a field trip to our revolutionary battle monument, Battle Monument Park, and when the seventh grade kids got off the bus, they 'just took off. Another time, I got a call from one of our teachers, who was actually at that same park, and he reported that he had found a 'misplaced' child and would I call and let the supervising teacher know, as he did not have that teacher's cell phone number. Things like that happen with kids that age. My own car got pretty well known because if I was out during the school day, and I saw a kid just walking along, I knew they weren't where they were supposed to be".

Superintendent Bryant's investigation and recommendation notwithstanding, by the end of April 2007, "some members of the community" were still lobbying him to "bring charges" against Ms. Usack. As Dr. Bryant testified: "At the time, John Ryan was

completing the investigation and, after he reported what had happened on other trips, I thought that would settle it. But I then learned that Board members Graham, Woods and Hurley, as well as Mary Beth Turner, as I recall, were insisting on a board meeting. Mary Beth Turner told Mike Crimmins that if I didn't convene such a meeting, she would request a 'special' Board meeting, maintaining that she was 'within her rights' to do so". Soon after that conversation, a Board meeting was convened, during which Dr. Bryant again recommended that the Respondent be issued a "Counseling Memo", in lieu of formal discipline.

According to the former Superintendent's unrefuted testimony, there was no support for that recommendation and the Board continued to pressure him to implement formal disciplinary action against Assistant Principal Usack. When asked what action the Board contemplated taking against Assistant Principal Knight, regarding his missing student IH, Dr. Bryant stated: "Really, nothing. The kids strayed, and then they came back. Those things happen with kids that age." When asked what he thought would have happened if he had not followed the Board's "strongly worded recommendation" to file disciplinary charges against Usack, the Superintendent opined: "I think two things would have happened. Mr. Graham indicated that State Ed. law allowed that 'anyone could bring charges so if I wasn't going to do it, they would'; let's just say, I felt my own tenure would be tenuous".

In short, Superintendent Bryant's testimony establishes that the Board members were determined to lodge §3020 (a) charges against Ms. Usack, irrespective of whether he filed such charges as District Superintendent and irrespective of whether the evidence supported such charges; and if he did not comply with the Board's "recommendation" that he file the charges as District Superintendent, his own

termination was "a real possibility". Against that context, Dr. Bryant reluctantly asked Attorney Ryan to draft charges proposing "the minimum we thought the Board would accept".

Ms. Usack received the following notification, dated August 16, 2006, over the signature of then Superintendent of Schools, Dr. Raymond Bryant:

YOU ARE HEREBY CHARGED pursuant to Education Law Sections 3012 and 3020-a with neglect of duty and conduct unbecoming a tenured assistant principal, which conduct constitutes just cause for discipline against you or your removal as follows:

### CHARGE 1: Conduct Unbecoming a Teacher and Misconduct

You are hereby charged with conduct unbecoming a teacher and misconduct in that:

Specification 1. On Friday, April 7, 2006, you accompanied students from the Ernie Davis Middle School eighth grade on a field trip to Washington, D.C. You were assigned and you accepted the responsibility to supervise at all times four named students while they participated in the activities in Washington D.C. One of the students was "CG".

Specification 2. After eating dinner with your four students and prior to departure from Washington D.C. on the evening of April 7, 2006, the student "CG" became separated from your group of four students.

Specification 3. There existed a period of time when the student "CG" was missing from your assigned group during which period you failed to discover her absence.

Specification 4. During this same period, you were interacting or otherwise engaged with individuals, including other chaperones or students, who were not the four students to whom (sic) you had been assigned to supervise.

Specification 5. The student "CG" was later found by Capital Park Police.

Specification 6. By reason of the foregoing, you endangered the safety of students and engaged in conduct unbecoming a teacher and in misconduct by failing to provide adequate supervision to ensure the presence of all four assigned students at all times.

### CHARGE 2: Neglect of Duty; Incompetent or Inefficient Service

You are hereby charged with neglect of duty and with incompetent or inefficient service in that:

Specification 1. On Friday, April 7, 2006, you accompanied students from the Ernie Davis Middle School eighth grade on a field trip to Washington, D.C. You were assigned and you accepted the responsibility to supervise at all times four named students while they participated in the activities in Washington D.C. One of the students was "CG".

Specification 2. After eating dinner with your four students and prior to departure from Washington D.C. on the evening of April 7, 2006, the student "CG" became separated from your group of four students.

Specification 3. There existed a period of time when the student "CG" was missing from your assigned group during which period you failed to discover her absence.

Specification 4. During this same period, you were interacting or otherwise engaged with individuals, including other chaperones or students, who were not the four students to whom you had been assigned to supervise.

Specification 5. The student "CG" was later found by Capital Park Police.

Specification 6. By reason of the foregoing, you endangered the safety of students and neglected your duty and rendered incompetent and inefficient service by failing to provide adequate supervision to ensure the presence of all four assigned students at all times.

### CHARGE 3: Conduct Unbecoming a Teacher and Misconduct

You are hereby charged with conduct unbecoming a teacher and misconduct in that:

Specification 1. On Friday, April 7, 2006, you accompanied students from the Ernie Davis Middle School eighth grade on a field trip to Washington, D.C. You were assigned and you accepted the responsibility to supervise at all times four named students while they participated in the activities in Washington D.C. Two of the students were "SH" and "PD".

Specification 2. After eating dinner with your four students and prior to departure from Washington D.C. on the evening of April 7, 2006, the students "SH" and "PD" became separated from your group of four students.
Specification 3. There existed a period of time when the students "SH" and "PD") were missing from your assigned group during which period you failed to remain aware of their location and activities.

Specification 4. During this same period, you were interacting or otherwise engaged with individuals, including other chaperones or students, who were not the four students to whom you bad been assigned to supervise.

Specification 5. The students "SH" and "PD" were later found by Capital Park Police.

Specification 6. By reason of the foregoing, you endangered the safety of students and engaged in conduct unbecoming a teacher and in misconduct by failing to provide adequate supervision to ensure the presence of all four assigned students at all times.

### CHARGE 4: Neglect of Duty; Incompetent or Inefficient Service

You are hereby charged with neglect of duty and with incompetent or inefficient service, in that:

Specification 1. On Friday, April 7, 2006, you accompanied students from the Ernie Davis Middle School eighth grade on a field trip to Washington, D.C. You were assigned and you accepted the responsibility to supervise at all times four named students while they participated in the activities in Washington D.C. Two of the students were "SH" and "PD".

Specification 2. After eating dinner with your four students and prior to departure from Washington D.C. on the evening of April 7, 2006, the students "SH" and "PD" became separated from your group of four students.

Specification 3. There existed a period of time when the students "SH" and "PD" were missing from your assigned group during which period you failed to remain aware of their location and activities

Specification 4. During this same period, you were interacting or otherwise engaged with individuals, including other chaperones or students, who were not the four students to whom you had been assigned to supervise.

Specification 5. The students "SH" and "PD" were later found by Capital Park Police.

Specification 6. By reason of the foregoing, you endangered the safety of students and neglected your duty and rendered incompetent and inefficient service by failing to provide adequate supervision to ensure the presence of all four assigned students at all times.

Based on the conduct set forth in these charges, I am seeking a penalty of five (5) days suspension without pay as a tenured assistant principal in the Elmira City School District. [6]

## Positions of the Parties

The following statements of position are extrapolated from the respective post hearing briefs filed by Counsel.

### The District

In light of Respondent's failure to adequately supervise the students placed in her care, she was charged with neglect of duty and conduct unbecoming a tenured assistant principal. It is obvious that she showed extremely poor judgment in permitting the students to leave her company. Allowing eighth grade students to walk around unattended was entirely unreasonable considering, among other things, the Mall's expansive size, the students' lack of familiarity with the surrounding area, the large number of unknown (and potentially dangerous) people simultaneously moving through the Mall area, and the fact that dusk was approaching as the students set out on their own. The additional fact that Student CG had a well-known history of absenteeism and other forms of misconduct makes Respondent's lax supervision all the more troubling.

---

[6] The Board Members rejected the Superintendent Bryant's proposed 5-day suspension penalty and some pushed for escalation to a discharge. Eventually, the Board settled on a 20-day suspension of Ms. Usack without pay as the penalty sought.

This proceeding does not concern whether certain parties have resisted Respondent's reform initiatives. Neither does it concern whether Respondent is a competent administrator. It is solely concerned with Respondent's conduct on the evening of April 7, 2006. On this point, the facts could not be clearer. Respondent allowed three students to move ahead of her group without adult supervision. She failed to keep the students within view and allowed thirty minutes or more to pass before making an effort to determine their whereabouts. This represented an undue risk to the students' safety and exposed the District to significant potential liability. For all of these reasons, Respondent is guilty of the charges against her by far more than a simple preponderance of the evidence.

Respondent plainly neglected her duty to supervise the students in her group and should be penalized accordingly. Her actions exhibited an extreme lack of care. As such, her conduct was plainly unbecoming a tenured assistant principal and constituted a serious neglect of her duty to supervise the students with the same care and prudence as a reasonably minded parent or guardian. To argue, as Respondent does, that no penalty is warranted in this instance is both nonsensical and contrary to precedent. A twenty-day suspension without pay is entirely reasonable, given Respondent's conduct and the forms of discipline imposed in prior proceedings.

## The Respondent

The Charges fail for three reasons. First, the District failed to introduce competent and sufficient evidence in support of the Charges. Second, the District has not shown the presence of Just Cause, which is required to impose discipline. Just Cause is unavailable because its notice component is lacking given the absence of any relevant Board policy regarding class trips and any relevant provisions for this trip in particular. Therefore, Ms. Usack had no notice that any of her proven actions or inactions could result in discipline. Third, Just Cause is precluded also by the selective prosecution of Ms. Usack for events and behavior for which previously no District official or employee has been disciplined in prior, similar instances. This disparate treatment also precludes Just Cause.

In the final analysis, the District did not meet its burden by a preponderance of the evidence and the charges should be dismissed in their entirety. The District's chief administrative officers as well as Ms. Usack's immediate supervisor did not believe her behavior warranted any form of discipline. These administrators insisted Charges were unwarranted both substantively and constitutionally. Nevertheless, the Board rejected those objections and insisted Charges be filed or it would punish or fire School Superintendent Raymond Bryant and Human Resources Director Bob Van Keuren. Under the Board's ultimatum, the superintendent reluctantly filed the Charges at issue. Not surprisingly, at the hearing, the Board failed to adequately support the charges.

These circumstances demonstrate the frivolity of the charges, which emphatically warrants the imposition of sanctions against the District. The instant charges are an example of an abuse of power that was condemned by the Commissioner of Education in the early 1990s. As the supporting affidavits show, Ms. Usack and her counsel have expended significant costs in defending this baseless disciplinary arbitration. These costs should be reimbursed upon the hearing officer's finding of frivolity.

## OPINION OF THE HEARING OFFICER

Under amended §3020 of the Education Law, Ms. Usack cannot be disciplined or removed from her position, except for "just cause". As I have held in prior cases, the statutory standard of §3020 (a) "just cause" is not expressly defined in the Education Law or in Education Department regulations, but a working definition has evolved over the years in the myriad decisions of Hearing Officers. Some have simply applied the administrative law standard of "arbitrary, unreasonable or capricious". But the better reasoned majority have adopted the "common law" definition evolved from thousands of reported decisions by arbitrators of "just cause" discipline cases arising under collectively bargained labor-management agreements in both the private and public sectors. *See. e.g.,* In re Board of Education. Wayne-Finger Lakes Board of Cooperative Educational Services (Donald Bogart), Decision No. 13,226 (1994); In re Greenburgh Central School Dist. No. 7 (Robert DeMichele), Decision No. 13/397 (1995); Appeal of Bd. of Ed. of Port Washington, Decision No. 14,280 (1999). *See also* South Eastern Pennsylvania Transportation Authority, 90 LA 844 (Lang, 1988); Carter-Wallace Inc. 89 LA 587 (Katz, 1987); Menasha Corporation. Lewisystems Division, 89 LA 1316 (Barren, 1987); Hussman Refrigerator Company, 68 LA 656 (Mansfield, 1977); Kroger Company, 25 LA 906 (Russell Smith, 1955), Warren Assemblies. Inc., 92 LA 521, 524 (Roumell, 1989); Pete Pasquinell Co., 68 LA 1068, 1070 (Jones, 1977); Polysar Incorporated, 91 LA 482, 484 (Strasshofer, 1988); SK Hand Tool Corp., 98 LA 643, 647 (Hodgson, 1992); Koven and Smith, Just Cause: The Seven Tests, 2nd Ed. (BNA, )at 8-9.

One such frequently cited arbitration decision contains the following just cause analysis checklist. *See* Enterprise Wire Company 46 LA 359 (Daugherty, 1966):

> Question 1. Did the employer give to the employee forewarning or foreknowledge of the possible or probable disciplinary consequences of the employee's conduct?

> Question 2. Was the employer's rule or managerial order reasonably related to (a) the orderly, efficient, and safe operation of the company's business and (b) the performance that the company might properly expect of the employee?

> Question 3. Did the employer, before administering discipline to an employee, conduct a fair and objective investigation to determine whether the Employee did in fact violate or disobey a rule or order of management?

> Question 4. Does the investigative record contain substantial evidence or proof that the employee was guilty as charged?

> Question 5. Has the employer applied its rules, orders, and penalties even handedly and without discrimination to all similarly situated employees?

> Question 6. Was the degree of discipline administered by the employer in a particular case reasonably related to (a) the seriousness of the employee's proven offense and (b) the service record of the employee?

The District presented four witnesses in support of its alleged factual premises for the charges and specifications: EDMS Principal Lisa Kelly, EDMS Assistant Principal Mack Knight, EDMS Teacher Ginger Woolever and EDMS Student CG. The consistent, credible and forthright testimony of Ms. Kelly and Mr. Knight contradict rather than support the District's allegations against the Respondent. Moreover, both of those District witnesses fully corroborate Ms. Usack's account of the incident, as does the testimony of Respondent's witnesses Bryant, Wallace and Zigenhagen. By contrast, the testimony of the District's other two witnesses, teacher Ginger Woolever and student CG, exhibit significant relevancy and credibility defects which render their contrary accounts of the incident on April 7, 2006 unworthy of belief.

On the threshold question of culpability, the record shows irreconcilable credibility conflicts between the sworn testimony of the District's chief witnesses and that of the charged employee and the other witnesses. Testimonial standoffs are not rare in adversarial proceedings and resolution of diametrically opposing testimony is a task which arbitrators frequently are called upon to perform. Numerous factors must be considered in making credibility determinations. These include: (1) The witness's opportunity and capacity to observe the event or act in question; (2) the witness's character; (3) any prior inconsistent statement by the witness; (4) a witness's bias, or lack of bias; (5) the contradiction of the witness's version of events by other evidence or its consistency with other evidence; (6) the inherent improbability of the witness's version of events; and (7) the witness's demeanor.

In some cases, ostensibly differing recollections of witnesses can be reconciled in different but coherent and believable versions of "the Truth". In this case, however, it is apparent that District witnesses CG and Woolever did not give persuasive or even believable testimony. Specifically, CG's testimony that she "got lost" because Usack left her all on her own on the National Mall, but dutifully reported to the bus rendezvous point only to find no one from EDMS there, is flatly contradicted by all of the record evidence. Moreover, assertions by CG regarding her whereabouts and motivations for leaving her group that day are completely inconsistent with statements she gave to the District's school attorney during his investigation. Indeed, that evidence not only effectively impeaches the testimony CG gave at the hearing but also supports the former Superintendent's original assessment that she intentionally wandered away that day to pursue a separate agenda of her own.

Ms. Woolever's testimony is fatally undermined primarily by her long-standing admitted *animus* against Ms. Usack and her personal motivation to have Usack removed from the District; a personal bias and ulterior motive which Ms. Woolever openly acknowledged and amply demonstrated at the hearing in this matter. [7] In that regard, Woolever testified she considered Usack, with whom she had worked in another district before coming as a probationary teacher to Elmira, "involved in" the decision of that other district to deny her tenure. In addition to that lingering resentment, the record persuasively demonstrates that Woolever had good reason to deflect blame for the many shortcomings of the trip to someone other than herself. Finally, the record is replete with evidence that Woolever was one of several teachers subject to possible involuntary transfer from EMDS as part of the District Administration's corrective action plan at that historically underperforming school.

If Ms. Woolever's demonstrated bias against Ms. Usack were not discrediting enough, her hearing testimony also is riddled with self-contradiction, inconsistency, evasiveness, duplicity and outright implausibility. Just one example is the preposterous claim that she personally sprinted "as fast as humanly possible" from the Lincoln Memorial to the Washington Monument, circled that Monument twice trying to locate CG, and then dashed back to the Lincoln Memorial--all in the paranormal time of "no more than 10 minutes."

---

[7] Indeed, under cross-examination by Usack's attorney at the hearing, Woolever concluded her testimony with the summary declaration: "I don't like your client". She also conceded that she was one of several similarly disaffected EMDS teachers and a displaced EDMS administrator who pressured the Board for months to bring disciplinary charges against Usack. In that connection, Woolever admitted initiating personal back channel assistance to the four Board members who insisted upon bringing charges against the Respondent, despite the Ryan investigation and the Superintendent's recommendations.

# CONCLUSIONS

Under any and all of the above-quoted principles and authoritative precedent, the District failed to meet its burden of proving the charges it lodged against the Respondent. For that reason alone, there is no just cause for imposition of the proposed disciplinary action. Even if, *arguendo,* the District had persuasively demonstrated that some degree of culpability attached to Ms. Usack (which it failed to do), singling Usack out for discriminatory and disparate disciplinary action while overlooking identical conduct by her colleague Mack Knight (which it did do), violated the just cause standard. In that regard, it is also undisputed that, except for unjustly targeting Usack for disparate treatment in this case, the District did not take formal disciplinary action against teachers or administrators in virtually indistinguishable facts and circumstances. In short, to sustain the Board's prosecution of these charges against this Respondent in the facts and circumstances of this record would violate the fundamental just cause principle that disciplinary action of an employee be imposed fairly and justly to correct proven culpable negligence, incompetence or misconduct; not simply to harass and punish the charged employee.

In the 1990's the Commissioner of Education noted in a series of decisions Appeal of Bd. of Ed. Eastchester U. F S. Q. 31 EDR 301 (1992); Appeal of Bd of Ed. Goshen CSD, 30 Ed. Dept. Rep 181, 187, (1990); Matter of Bott v. Bd. of Ed., 41 NY2d 265 (1997) that "[t]he primary purpose of a disciplinary hearing is not punitive, but rather, to determine a teacher's fitness to teach and to carry on professional responsibilities... As [the Commissioner] noted, in Goshen, *supra,* '[t]his case raises serious questions about the use of the 3020-a process for multiple charges that largely lack substance and, in only one instance, even approach the level of teacher misconduct.'

. . . In such cases, one must question whether the extraordinary expenditure of time, energy, and resources is warranted. Given the high stakes in such proceedings and the obvious diversion of resources, I urge the district to consider less drastic alternatives to resolve personnel matters that, on the whole, fail to raise to the level of serious misconduct." Appeal of Bd. of Ed. Eastchester U.F.S.D, *supra* at 312

The New York State Legislature heard the Commissioner's concerns and amended Education Law in 1994, by directing a §3020-a hearing officer to formulate appropriate penalties against school districts for bringing such politically motivated prosecutions completely lacking in merit. Thus, Education Law §3020-(a)(4)(c) was enacted to provide for the reimbursement of State Education Department ("SED") costs and legal fees and costs incurred by a Respondent professional educator as a result of a District bringing, in whole or in part, "frivolous" charges. Specifically, Education Law Section 3020-a(4)(c), provides, in pertinent part (Emphasis added):

> The school board's decision to proceed with the charges may not be arbitrary, capricious, or discriminatory. If a hearing officer determines that any or all 3020-a charges filed against a teacher or administrator are frivolous, a district will have to reimburse the State Education Department and the teacher for all or a portion of the reasonable costs incurred as a result of the hearing, including the teacher's or administrator's attorney fees. The hearing officer shall indicate in the decision whether any of the charges brought by the employing board were frivolous as defined in section eight thousand three hundred three-a of the civil practice law and rules. If the hearing officer finds that all of the charges brought against the employee were frivolous, the hearing officer shall order the employing board to reimburse the state education department the reasonable costs said department incurred as a result of the proceeding and to reimburse the employee the reasonable costs, including but not limited to reasonable attorneys' fees, the employee incurred in defending the charges. If the hearing officer finds that some but not all of the charges brought against the employee were frivolous, the hearing officer shall order the employing board to reimburse the state education department a portion, in the discretion of the hearing officer, of the reasonable costs said department incurred as a result of the proceeding and to reimburse the employee a portion, in the discretion of the hearing officer, of the reasonable costs, including but not limited to reasonable attorneys' fees, the employee incurred in defending the charges.

In the final analysis, the record supports the conclusion that this case is not about negligence or incompetence by the Respondent, but rather all about a school board's knowing misuse of its §3020 (a) disciplinary powers by bringing frivolous charges against Assistant Principal Usack, in furtherance of a political agenda. Indeed, such abuse of power prompted Chancellor Emeritus of the New York State Board of Regents, Carl Hayden, to comment publicly: "There is nothing more unseemly to me than what I read about persistently in our paper, and I'm thinking in particularly about Elmira, where what we end up witnessing is a fight between adults over power." *(Elmira Star Gazette*, June 6, 2008). The conduct of the Elmira City School Board in bringing and prosecuting meritless charges against Teresa Usack, which were unsupported by its own investigations and dismissed for complete failure of proof after hearing, was precisely the type of power abuse which prompted the SED to recommend and the New York Legislature to enact Section 3020-a (4)(c) of the New York State Education Law.

### AWARD

1)      For all of the reasons stated, *supra,* Charges 1,2,3 and 4 made against the Respondent Theresa Usack, by the Elmira City School District under §3020(a) of the NYS Education Law on August 16, 2006, are dismissed.

2)      Pursuant to the authority vested in me by Education Law §3020-a 4(c), the Elmira City School District is ordered to reimburse the NYSED the reasonable costs said Department incurred as a result of this proceeding and to reimburse the Respondent Theresa Usack for $4,330.00 of the legal fees and costs set forth in her sworn affidavit dated July 21, 2010.

_____
Nancy Faircloth Eischen
Signed at Spencer, New York on February 17, 2011

STATE OF NEW YORK
COUNTY OF TOMPKINS SS:

On this 17th day of February 2011, I, NANCY FAIRCLOTH EISCHEN, do hereby affirm and certify, that I am the individual described herein, that I executed the foregoing instrument and acknowledge the same as my decision on NYSED File #6, 371.

24

_____

In the Matter of

**UNITED FEDERATION OF TEACHERS, LOCAL 2,**
**AFT, AFL-CIO,**

                  Charging Party,

        -and-                              **CASE NO. U-32479**

**BOARD OF EDUCATION OF THE CITY SCHOOL**
**DISTRICT OF THE CITY OF NEW YORK,**

                  Respondent.

_____

        **ROBERT T. REILLY, GENERAL COUNSEL (ARIANA A. DONNELLAN of**
        **counsel), for Charging Party**

        **KAREN SOLIMANDO, EXECUTIVE DIRECTOR OF LABOR RELATIONS**
        **(ALLISON S. BILLER of counsel), for Respondent**

                      **BOARD DECISION AND ORDER**

      This case comes to us on exceptions filed by the Board of Education of the City

School District of the City of New York (District) to a decision of an Administrative Law

Judge (ALJ), granting an improper practice charge alleging that the District violated

§ 209-a.1 (d) of the Public Employees' Fair Employment Act (Act).[1]  The charge alleged

that the District violated the Act when it unilaterally began placing a "flag" in its computer

system next to the names of unit employees represented by the United Federation of

Teachers, Local 2, AFT, AFL-CIO (UFT), who have been the subject of discipline,

allegedly causing those employees to be denied opportunities for transfers and

permanent assignments.  Originally, the ALJ dismissed the charge, finding that the

flagging process was a duplicate, digitized version of certain documents in employees'

_____

[1] 54 PERB ¶ 4522 (2021).

personnel files and that the manner in which the District maintains employees' personnel files was not a mandatory subject of negotiations.[2]  On exceptions to that decision, the Board remanded the matter to the ALJ for further development of the record.[3]  On remand, the ALJ found that the "flagging" impacted terms and conditions of employment, and that the District had violated the Act by instituting the flagging system. On April 7, 2022, oral argument was held before the Board.

EXCEPTIONS

The District has filed nine exceptions to the ALJ's decision.  In its first two exceptions, the District asserts that the ALJ incorrectly found a violation of § 209-a.1 (d) of the Act on the basis that the evidence did not support her conclusion that employees are unable to inquire through the UFT "what specific documents are linked to a flag."  To the contrary, the District contends, the testimonial evidence was that the UFT could obtain this information through the District and could check its accuracy by inspecting the complete paper personnel file.[4]

The District's third and fourth exceptions reject the ALJ's finding that neither an employee nor her UFT representative has access to the Galaxy system and neither is able to personally view the flagged documents and whether they actually reflect the contents of the documents in the personnel file.  Rather, the District maintains that the ability to view the documents as maintained in the personnel file allows the UFT and its members to verify the flagged documents.  Additionally, the District asserts that the UFT

---

[2] 51 PERB ¶ 4561 (2018).
[3] 52 PERB ¶ 3009 (2019).
[4] Exceptions 1-2.

did not request such documents be produced, as such documents are redundant of the personnel file, and thus "there is no reason why the [District] would not provide this information."[5]

In exceptions five and six, the District argues that the ALJ erred in finding that "the record is clear that flagging affects principals' decisions whether to select a teacher in his or her school." To the contrary, the District maintains that "the record shows that the purpose of the flagg[ing] procedure is to give principals the opportunity to consider or reconsider their decision after they have viewed the flagged documents."[6] The District further claims that no evidence was introduced that any teacher failed to obtain a transfer on the basis that they had been "flagged" in the Galaxy system.

The District further alleges that there is no contractual right to a transfer, and that "flagged" employees have the same right to apply for a transfer as those who have not been flagged, and that there is no basis to require the digitization of the entire personnel files. Additionally, the District contends that principals have multiple ways of learning about disciplinary histories, and, further, just as principals are not required to view the paper files, so too "they are not required to view the flagged documents" before making their hiring decision.[7]

The District further excepts to the ALJ's finding that "when viewing flagged documents, principals are viewing only negative information contained in an employees personnel file, without any information that might counterbalance the negative

---

[5] Exceptions 3-4.
[6] Exception 5.
[7] Exception 6, quoting 54 PERB ¶ 4522, at 4652-4653.

information such as years of positive observation reports or other positive material that may affect a principal's decision."[8]  Finally, the District excepts to the ALJ's finding that "the record shows that, in certain cases, letters annexed to a flag will be inaccurate if an employee is found, in arbitration, to have not engaged in the conduct set forth in a file letter, or to have engaged in a less severe misconduct."[9]

The UFT supports the ALJ's decision and contends that no basis has been demonstrated for reversal.

For the reasons given below, we affirm the ALJ's decision.

## FACTS

The facts in this matter are fully set out in the ALJ's thorough decision and are only addressed here as necessary to decide the exceptions.  On March 15, 2012, the District announced plans to initiate a new method of "flagging" negative work history in an online disciplinary support system that is linked to and accessible through its "Galaxy" computer system, an online budgetary system that provides a table of organization for all District offices and schools.

The flagging procedure makes information regarding an employees' disciplinary history with the District available to school principals when an employee is applying for a new position.  The information is only available to principals if they indicate in Galaxy that they intend to hire an individual for a position in their school.[10]  This process is

---

[8] Exception 7, quoting 54 PERB ¶ 4522, at 4653.
[9] Exception 8, quoting 54 PERB ¶ 4522, at 4653.
[10] Although the parties refer to the "hiring" of individuals, most of the individuals in question are already District employees, who are simply applying to transfer to a position at a different school or are seeking a permanent assignment.  Some applicants may also be former District employees, who are seeking to return to the District.

referred to as "intending" an employee in Galaxy. If an employee's name has been flagged, a "flag symbol" will appear next to the employee's name when a principal "intends" the individual's name in Galaxy.[11] The appearance of the "flag symbol" indicates that there is information that is available to the principal by clicking on the flag. One or more digitized documents may be linked to a flag and can be viewed by the "intending" principal. However, the District has represented that the decision whether or not to click on the flag symbol and see the attached documents remains for the principal; the District "considers the *optional* review of the disciplinary support unit flag by hiring Principal/supervisor as an opportunity to learn about an employee's prior history-similar to checking reference[s] before making a hiring decision."[12]

When an "intending" principal moves to proceed, a dialogue box appears, headed "Notification of Prior Disciplinary Action." This dialogue box does not provide any hyperlink to pdf documents. It states that the prospective hire/transfer "has been disciplined (on occasion(s) due to a prior report(s) of allegations of misconduct that have been substantiated.") The box instructs that for the intending principal to obtain more information she should "contact your Senior Field Counsel or CFN HR Director."[13]

The dialogue box then states: "If you wish to proceed with the action to intend to bring this individual onto your budget please click below to acknowledge that you are aware of and acknowledge the prior disciplinary action concerning this individual."[14]

---

[11] District Brief at 6, citing Jt Ex 1. As the "flag symbol" is not reproduced in the cited Exhibit, and the system is not available to the UFT, we adopt the District's characterization for purposes of this decision.
[12] *Id* (citing Tr, at 83-84 (Rodi) emphasis in original).
[13] Jt Ex 1.
[14] *Id.*

"Intending" principals are given the option in the Galaxy system of proceeding with the hire or of cancelling the hire.[15] In the event that the principal continues with "intending" the individual to the job, he or she is required to acknowledge awareness of the prior disciplinary action concerning the individual.[16]

At the bottom of the dialogue box, two buttons allow the "intending" principal to either "Apply" (thereby submitting a final decision either to proceed with or to cancel the hire) or to "Cancel" (thereby allowing the "intending" to pursue further information, either through the flag symbol and its attached documents, or the resources specified in the dialogue box).[17]

Katherine Rodi, Director of the District's Office of Employee Relations, oversees the Disciplinary Support Unit (DSU), which manages the District's online disciplinary support system. The DSU tracks employee discipline and is responsible for flagging employee names when appropriate. The DSU began flagging employee names in approximately May of 2012.

Rodi testified that the DSU will place a flag next to an employee's name in the Galaxy system only when two criteria are met. First, a substantiated report of discipline or misconduct must have been issued by one of the District's three investigatory bodies: the Office of the Special Commissioner of Investigation, the Office of Special Investigations, or the Office of Equal Opportunity.[18] Second, the DSU must have

---

[15] *Id.*
[16] *Id.*
[17] Jt Ex 1.
[18] Tr, at 73, 76.

evidence that the employee received a copy of the relevant disciplinary document.[19] That evidence normally consists of the employee's signature on the letter to be flagged, or on a mail receipt.[20] If those criteria have been met, the DSU will manually flag the employee's name in the Galaxy system and will link a copy of the disciplinary document in question to the flag.

Rodi explained the several steps that must occur before a document is issued that can lead to the flagging of the employee's name in Galaxy. Initially, one of the three investigatory bodies mentioned above must have conducted an investigation that resulted in a report substantiating an allegation of wrongdoing against the employee. Next, the principal must meet with the employee to discuss the report. If the principal issues a disciplinary letter as a result of the meeting, that letter may serve as a basis for a flag. As set forth above, the DSU must also have evidence that the employee received a copy of that letter.[21] Rodi testified that only documents that are in an employee's personnel file can serve as a basis for flagging an employee's name. If an employee files a rebuttal to the letter of discipline, the rebuttal letter is also linked to the flag in Galaxy.[22] Disciplinary letters issued by principals due to misconduct that have not been substantiated by an investigatory body, such as a letter admonishing an employee for lateness, may not serve as a basis for flagging an employee's name and cannot be annexed to a flag.[23]

---

[19] Tr, at 73.
[20] Tr, at 81.
[21] Tr, at 90.
[22] Tr, at 81.
[23] Tr, at 108.

Other documents that can be linked to a flag are those resulting from a disciplinary proceeding held pursuant to § 3020-a of the New York State Education Law (EL), but only if the employee was brought up on charges based on misconduct that is set forth in a disciplinary letter that meets the criteria for imposing a flag. An award or settlement issued as part of such a proceeding can be attached to a flag, but only if the award or settlement includes a finding or admission of culpability relating to the initial disciplinary letter.[24]

A flag remains next to an employee's name as long as the underlying disciplinary letter remains in the employee's file.[25] Rodi testified that the DSU will remove a flag or a document linked to a flag if an award issued in a EL § 3020-a disciplinary proceeding dismisses the charges against an employee based on a finding that the alleged misconduct did not occur, and if the award directs the District to remove the underlying disciplinary letter from the employee's personnel file.[26] If an award finds that the misconduct occurred, but is insufficient for dismissal, the flag will remain next to the employee's name, because the underlying letter finding misconduct remains in the employee's personnel file. The DSU will also remove a flag if a settlement requires it to remove the disciplinary letter on which the flag was based. Similarly, the DSU will remove a flag if an employee successfully pursues a grievance challenging a letter on which a flag is based, and the grievance decision directs the District to remove that

---

[24] Tr, at 90-91. The EL § 3020-a disciplinary charges are not linked to a flag. Tr, at 109.
[25] Tr, at 113.
[26] Tr, at 95, 98.

letter from the employee's personnel file.[27]

According to the District, all documents linked to a flag are already included in employees' personnel files.  Although the UFT is unable to view the flags and the documents linked to them, it does not dispute that the linked documents are intended to be limited to the discipline related documents in each individual's personnel files.  Those paper files are maintained at the school where an employee is currently employed, or was last employed.  Because the District has not digitized the entire contents of employee personnel files, principals cannot view them online.  To view a copy of an employee's personnel file, a principal considering whether to hire an employee must contact the school where the employee's file is kept, and request that a copy be made and sent to him or her.  A principal should see, in an employee's personnel file, any document that has been flagged in Galaxy.

Rodi testified that the flag serves a purely informational function in assuring that a hiring principal is aware of flagged information.  She further testified that flagging an employee's name does not restrict an employee's ability to apply for a new position or impose any restriction or limitation on the employee.  Rodi testified that principals are not required to take, or refrain from taking, any action when an employee's name has been flagged; they may, if they so choose, hire an employee whose name is flagged.[28] Rodi testified that she personally knows principals who have hired employees whose

---

[27] Tr, at 113. The collective bargaining agreement between the parties includes a grievance procedure that allows employees to seek the removal of disciplinary letters from their personnel files.

[28] Tr, at 87-88.

names are flagged in Galaxy.[29]

Other than those working in the DSU, only an employee's current principal and the principal who intends to hire the individual can view whether an employee's name is flagged in Galaxy.[30]  However, before their names are flagged, employees have received a copy of the letter of misconduct that is linked to the flag and have been advised that the document has been placed in their personnel file.

Amy Arundell, the UFT's Director of Personnel, testified that she first learned of the flagging system in October 2012 when Mathew Polisheck, a unit member, called her and told her that a principal rescinded his offer of a position and told him that he could not hire him because there was a flag on his file in Galaxy.[31]  After Polisheck contacted her, Arundell received complaints from other employees who stated that they had interviewed for a position and were later told that they could not be hired, or that the principal had reconsidered his or her decision, because a flag was placed on their file in Galaxy.[32]  In Polisheck's case, Arundell learned that the principal decided not to hire him after learning of the existence of a substantiated case of discipline against Polisheck and a EL § 3020-a disciplinary proceeding.[33]

Prior to the implementation of the flag symbols, principals could only view online an employee's service history, which shows whether an employee was rated effective or ineffective in his or her yearly evaluation, and whether an employee was suspended.[34]

---

[29] Tr, at 123.
[30] Tr, at 83.
[31] Tr, at 154-155.
[32] Tr, at 161.
[33] Tr, at 180.
[34] Tr, at 89, 126.

To view an employee's disciplinary history, an "intending" principal would have to request the employee's personnel file from the employee's school.[35]

<u>DISCUSSION</u>

A public employer violates its duty to negotiate in good faith, in violation of § 209-a.1 (d) of the Act, when it unilaterally implements a change to a mandatorily negotiable term or condition of employment.[36] We have long held that procedures for transfer and transfers themselves "are a mandatory subject of negotiations."[37]

On remand, the ALJ reassessed her prior finding that Rodi's testimony demonstrated that "[e]mployees may inquire through the UFT whether their name has been flagged in Galaxy *and what documents are linked to a flag*."[38] As the ALJ correctly noted, we held that, although Rodi's testimony supports the first part of her finding, it does not support the latter part of that finding, and hence we remanded this issue for a full review of the record.[39]

On her review of the record, the ALJ concluded that the record does not support a finding that employees may inquire through the UFT to learn what specific documents

---

[35] Tr, at 78.

[36] *See, eg, Town of Islip v NYS Pub Empl Relations Bd*, 23 NY3d 482, 484, 47 PERB ¶ 7006 (2014); *Patchogue-Medford Union Free Sch Dist*, 30 PERB ¶ 3041, 3094 (1997); *Monticello Cent Sch Dist*, 22 PERB ¶ 3002, 3008 (1989), *enforced* 22 PERB ¶ 7022 (Sup Ct, Albany County 1989).

[37] *City of Buffalo*, 9 PERB ¶ 3024, 3040 (1976); *see also White Plains PBA*, 9 PERB ¶ 3007, 3009 (1976) ("Assignment of 'both permanent jobs and work details on the basis of preference and seniority is a term and condition of employment and thus a mandatory subject of negotiations.'"), quoting *City of Albany [Albany Firefighters]*, 7 PERB ¶ 3142, 3147 (1974).

[38] 52 PERB ¶ 3009, at 3043 (emphasis added by the ALJ).

[39] 51 PERB ¶ 4561, at 4764.

are linked to a flag."[40]

From there, the ALJ moved to consideration of the impact of this finding on the

claims before her. The ALJ's findings of fact and law here are instructive:

> The record is clear that flagging affects principals' decision whether to select a teacher for a position in his or her school. Principals see flags, and the documents linked to a flag, when they are in the process of selecting a teacher for a position in their school. At that point, the decision to select a teacher is not final. In fact, the purpose of the flagged procedure is to give principals the opportunity to consider, or reconsider, their decision once they have viewed the flagged documents.
>
> Although the flagged documents are included in an employee's official school file, the record shows that principals are not required to, and often do not, request a copy of a teacher's entire official file before finally deciding whether to select an employee for a position in their school. That is apparent from the fact that the record shows that only *if* a principal makes that request does the principal receive a copy. It is also apparent from the fact that the flagging system was created for that reason; that is, principals had placed employees in their school without being aware of the employees' negative disciplinary history involving serious matters.
>
> Further, when viewing flagged documents, principals are viewing only negative information contained in an employee's file, without any information that might counter-balance the negative information, such as years of positive observation reports or other positive material, that may affect a principal's decision whether or not to select an employee for a position. The record also shows that, in certain cases, letters annexed to a flag will be inaccurate if an employee is found, in arbitration, to have not engaged in the conduct set forth in a file letter, or to have engaged in a less severe misconduct.[41]

---

[40] 54 PERB ¶ 4522, at 4652. As neither the District nor the UFT submitted additional evidence, the ALJ relied on the evidence at the hearing before her; in her review, she based her determination on the limited information Arundell received from Rodi, that is, whether specific individuals had been flagged, and not the documents attached to the flags. *Id.*

[41] 54 PERB ¶ 4522, at 4563.

As the ALJ found, Rodi testified that flagged letters are only removed from Galaxy if the arbitration award specifically directs that the letter be removed from a teacher's official file. Therefore, a principal may view a flagged letter when the conduct underlying that letter has been held in arbitration to either not have occurred or to have occurred in a different manner or degree than that which is set forth in the flagged letter, if the arbitration award does not specifically direct removal of the letter.

The ALJ's factual determinations, particularly her credibility determinations, "are generally entitled to great weight unless there is objective evidence in the record compelling a conclusion that the credibility finding is manifestly incorrect."[42] No such objective evidence has been raised before us. The ALJ reasonably exercised her discretion in taking a closer look at the specific testimony of both Arundell and of Rodi on remand. Moreover, both parties had the opportunity to submit further evidence on the factual issues. Neither availed themselves of the opportunity, and they are now bound by the evidence they chose to submit.

We affirm the ALJ's finding that the District made a change to the procedures to be used to fill a position, a mandatory subject of negotiations. Prior to the implementation of the "flagging" system, an "intending" principal who wished to see an employee's disciplinary history would request the employee's full personnel file from the employee's school. The personnel file would include not only the employee's negative

---

[42] *Pine Valley Cent Sch Dist*, 51 PERB ¶ 3036, 3160 (2018), quoting *Village of Scarsdale*, 50 PERB ¶ 3007, n 51 (2017), *confd sub nom Village of Scarsdale v NYS Pub Empl Relations Bd*, 55 PERB ¶ 7008 (2d Dept 2022). *See also Pleasantville Union Free Sch Dist*, 51 PERB ¶ 3024, 3100 (2018); *Village of Endicott*, 47 PERB ¶ 3017, 3051 (2014).

disciplinary history, but also any positive history, such as positive performance evaluations, commendations from managers, and awards, that might counterbalance the disciplinary history. Under the new "flagging" system, however, such positive history is no longer available to "intending" principals, who receive only negative information on employees they intend to hire.

Moreover, prior to the change at issue here, whether to look at the personnel file at all was left to an "intending" principal's discretion. Now, the negative portion of an employees' personnel file is fed automatically to "intending" principals regardless of whether they express a desire to see the employee's personnel file or not. As the District concedes, this data is meant to be taken into consideration by the "intending" principals as they make their hiring decisions.

These changes, both the automatic nature of providing the information and providing solely the negative portions of the employee's personnel file, represent changes to the prior procedure as to effectuating transfers within the District. These changes have an adverse effect on employees' terms and conditions of employment as the "intending" principle receives a purely negative, decontextualized version of the personnel file, unlike in the past, where "intending" principals, if they saw the personnel file at all, would see the full personnel file, including both positive and negative history. Consistent with our prior precedent, we find these unilateral changes to the procedure used to fill positions affect terms and conditions of employment, and are a mandatory

subject of bargaining.[43]  For that reason, we affirm the ALJ's finding that the District

violated the Act.

We do not find the adoption of flagging to be in and of itself a disciplinary action.

The record is clear that teachers who have been flagged remain eligible to apply for

transfers just as do their colleagues who have not been.  Rather, we grant relief

because of the unilateral change of procedures impacting terms and conditions of

employment—here, by procedurally incentivizing principals to peruse and assess prior

discipline, or, at a minimum, requiring them to acknowledge the existence of such

discipline.  For these reasons, we find that the unilateral adoption of this new procedure

without negotiation with the UFT violates § 209-a.1 (d) of the Act.

The charge also states that "[i]n addition, none of the affected employees would

have an opportunity to review the information upon which the 'flag symbol' was entered

or to ascertain or contest whether the disciplinary action the entry is based on actually

occurred or is in error."[44]  Later in the charge, the UFT asserts that the District "failed to

bargain in good faith over a mandatory subject of bargaining—employee discipline,

*transfer* and other personnel actions—and therefore committed an improper practice

---

[43] *See Niagara Falls Police Captains and Lieutenants Assn*, 33 PERB ¶ 3058, 3161
(2000) ("We have held . . . that the procedures to be used to fill a position . . . are a
mandatory subject of negotiation."), citing *Schenectady Patrolmen's Benevolent Assn*,
21 PERB ¶ 3022 (1988); *Dutchess County BOCES Faculty Assn, NEA/NY*, 17 PERB ¶
3120 (1984), *confd sub nom Matter of Dutchess County Bd of Coop Educ Serv,* 122
AD2d 845, 19 PERB ¶ 7018 (2d Dept 1986); *White Plains Police Benevolent Assn*, 9
PERB ¶ 3007 (1976).  *See also Dutchess Community College and County of Dutchess*,
46 PERB ¶ 3009, 3016 (2013).  *See generally City of Watertown v State of NY Pub
Empl Relations Bd*, 95 NY2d 73, 33 PERB ¶ 7007 (2000) ("bargaining is mandatory if
the procedures qualify as a "term and condition" of employment").
[44] Charge, ¶ 6.

under the Act."[45]  Among the relief sought, the charge requested an order "compelling the Board to negotiate in good faith with the UFT regarding the implementation, procedures for and impact of the employee 'flag symbols.'"[46]

We note that we have long held that "the right of an employee to review his personnel file bears a direct and significant relationship to working conditions, including possible demotion, promotion, and discipline, rendering the demand mandatorily negotiable."[47]  Here, the District has culled out the disciplinary history portion of the personnel file, and made only that portion easily and immediately available for principals to consult in determining whether or not to finalize the decision to grant an employee's request to transfer, or an application to a promotional position.  Indeed, by requiring the "intending" principal to acknowledge that she is aware that the employee has a disciplinary history, the District has created an incentive for the "intending" principal to consult the digitized materials.

The convenience of accessing the digital excerpt from the personnel file, rather than taking the steps to obtain the full paper file, mean that the excerpted digital materials are more likely than not to be used in place of the full file in making decisions as to transfers, promotions and other lateral hiring or recall decisions.  However, as the UFT has alleged, and the District has admitted, neither the UFT nor the individual

---

[45] Charge, ¶ 9 (emphasis added).

[46] Charge, ¶ 12.

[47] *City of Schenectady*, 21 PERB ¶ 3022, 3049 (1988); *Town of Carmel,* 29 PERB ¶ 3053, 3121-3122, n 3 (1996) ("notice of entries in personnel files" a mandatory subject). *See  generally Niagara Falls Police Club (Drinks-Bruder)*, 52 PERB ¶ 3007, 3029 (2019) (union satisfied its statutory obligation by successfully resolving a previously filed unit-wide grievance in the matter so that everyone, including the charging party, had the opportunity to review their personnel files).

employee has the ability to access the "flag symbol" and the materials attached thereto, to ascertain if they are in fact materials that have been properly placed, and properly remain, in the personnel file.

The reasons that underlay our finding in *City of Schenectady* that access to paper personnel files is a mandatory subject apply with full force and vigor to these digitized disciplinary history excerpts, which are every bit as likely, if not more so, to affect working conditions, including transfer, promotion and other opportunities. We therefore find that the District violated § 209-a.1 (d) of the Act by unilaterally instituting the flagging system without having negotiated with the UFT as to notification to employees that they have been "flagged" and access to the materials attached to the "flag symbol" sufficient to permit verification that such materials were placed in the employees' personnel files and properly remain within them.

These same factors lead us to conclude that the flagging system is not, as the District argued, a mere optional "opportunity to learn about an employee's prior history-similar to checking reference[s] before making a hiring decision." Moreover, the District concedes that this data is meant to be taken into consideration by the "intending" principals as they make their hiring decisions.

Taken as a whole, then, the flag, the dialogue boxes encouraging the intending principals to either review the flagged documents, seek information through Senior Field Counsel or the CFN HR Director, and the requirement, prior to finalizing or canceling the transaction, that the "intending" principal acknowledge the existence of the disciplinary history, effectively amount to the addition of a new procedure with respect to

such transfers.

Additionally, the flagging process may reasonably be found to establish a new criterion for such appointments, that is, the consideration of the applicant's disciplinary history.  As we have long held, a "criterion for appointment or promotion is a managerial prerogative beyond the scope of mandatory negotiation, if applicable only to prospective employees or to future promotion of current employees."[48]  The same considerations and the same result applies to criteria for transfers.[49]  Accordingly, we find that the UFT did not establish a violation of § 209-a.1 (d) of the Act by requiring principals to consider the disciplinary history of applicants for transfer or promotional positions.

However, we affirm the ALJ's finding that the "flagging" process is a mandatory subject of negotiations to the extent that the process affects terms and conditions of employment by denying employees notice that they have been "flagged" and an opportunity to view the materials attached to the "flag symbol" and to contest its appropriateness for inclusion as part of the personnel file.  To the extent that the District has imposed a new criteria for transfer and promotional applications, the consideration of the applicant's disciplinary history, we find that no violation of the Act has been established.  We note that our decision is made without prejudice to the right to bargain upon demand the impact of this decision.

---

[48] *Rensselaer City Sch Dist*, 13 PERB ¶ 3051, 3084-3085 (1980).  *See also City of Niagara Falls*, 33 PERB ¶ 3058, 3161-3162 (2000); *City of Buffalo*, 29 PERB ¶ 3023, 3053 (1996) (qualifications non-mandatory); *Addison Cent Sch Dist*, 13 PERB ¶ 3060, (1980) (criteria for promotion non-mandatory); *see generally Levitt v Bd of Collective Bargaining of the City of NY*, 79 NY2d 120, 128, 29 PERB ¶ 7516 (1992).
[49] *City of Schenectady*, 21 PERB ¶ 3022, at 3050-3051.

IT IS, THEREFORE, ORDERED that the District will forthwith:

1.    Negotiate in good faith with the UFT procedures by which unit employees who have been the subject of discipline are notified that they have been "flagged" in its "Galaxy" computer system, are able to verify the accuracy and propriety of inclusion of supporting documentation attached to the flag symbol, and seek removal of such materials as are not properly part of the personnel file; and

2.    Sign and post the attached notice at all physical and electronic locations customarily used by it to post notices to unit employees.

DATED:  June 13, 2022
        Albany, New York

John F. Wirenius, Chair

Anthony Zumbolo, Member

Rosemary A. Townley, Member

# NOTICE TO ALL EMPLOYEES

**PURSUANT TO**
**THE DECISION AND ORDER OF THE**

**NEW YORK STATE**
**PUBLIC EMPLOYMENT RELATIONS BOARD**

**and in order to effectuate the policies of the**

**NEW YORK STATE**
**PUBLIC EMPLOYEES' FAIR EMPLOYMENT ACT**

**we hereby notify all employees of the Board of Education of the City School District of the City of New York (District) in the unit represented by the United Federation of Teachers, Local 2, AFT, AFL-CIO (UFT), that the District will forthwith:**

1. Negotiate in good faith with the UFT procedures by which unit employees who have been the subject of discipline are notified that they have been "flagged" in its "Galaxy" computer system, are able to verify the accuracy and propriety of inclusion of supporting documentation attached to the flag symbol, and seek removal of such materials as are not properly part of the personnel file.

Dated **. . . . . . . . . .**        By **. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**

on behalf of the **BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK**

*This Notice must remain posted for 30 consecutive days from the date of posting, and must not be altered, defaced, or covered by any other material.*

DIRECT/RODI

1          Your next witness, please.

2          MS. BILLER:  I would like to

3     call Ms. Rodi, please.

4          JUDGE BLASSMAN:  Please

5     approach and I will swear you in.

6          Do you swear or affirm to tell

7     the truth and nothing but the truth in

8     this proceeding?

9          THE WITNESS:  I do.

10          JUDGE BLASSMAN:  Thank you.

11          Can you please state your full

12     name for the record.

13          THE WITNESS:  My full name is

14     Katherine Rodi, R-O-D-I.

15 DIRECT EXAMINATION

16 BY MS. BILLER:

17     Q.     By whom are you employed by?

18     A.     I'm employed by the New York

19 City Department of Education.

20     Q.     What capacity?

21     A.     I'm the director of the office

22 of Employee Relations.

23     Q.     How long have you held that

24 position?

1                    DIRECT/RODI

2      A.      I held that position for two

3 and a half years.

4      Q.      And prior to being the director

5 of Employee Relations, what other job titles

6 have you held within the Department of

7 Education?

8      A.      I was an agency attorney, I was

9 a senior counsel and I was the director of

10 the Disciplinary Support Unit.

11      Q.      As director of Employee

12 Relations, what are some of your job duties

13 and responsibilities?

14      A.      I oversee several units. I

15 oversee the Office of Personnel

16 Investigation, I oversee the Office of

17 Employee Relations, I oversee the Office of

18 Safety and Health, I oversee it, it is not

19 really an office, but the Disciplinary

20 Support Unit work.

21      Q.      Can you explain to us what the

22 Disciplinary Support Unit is?

23      A.      It is a unit within my office

24 that manages the on-line system that is the

25 Disciplinary Support System.

1    DIRECT/RODI

2              And what we do, we check and

3    track and eventually flag folks.  We check

4    older discipline, older substantiated

5    reports, we review them, we track them and

6    then if all the qualifications that we build

7    together are met, then we may flag a person.

8         Q.      Can you give us the years that

9    you were responsible for overseeing the

10   disciplinary support unit?

11        A.      I was hired in June of 2012.  I

12   started in July, early July of 2012.  Then I

13   was promoted to the director of Employee

14   Relations in January of 2013 and then I

15   subsumed DSU into my current work.

16              JUDGE BLASSMAN:  DSU?

17              THE WITNESS:  The disciplinary

18        support unit.

19              JUDGE BLASSMAN:  So, since when

20        have you been overseeing disciplinary

21        support.

22        A.      It has basically been under my

23   portfolio since July of 2012.

24        Q.      Are you aware when the flagging

25   was implemented, began to be implemented?

1                    DIRECT/RODI

2        A.        I was invited to a meeting

3    about disciplinary support projects, I want

4    to say it was like April of 2012 at that

5    meeting there were all the senior counsel, I

6    was in the role of senior counsel at the

7    time.  So, all the senior counsel, there

8    where I think there were superintendents,

9    other random DOE staff and we got a

10   presentation about the DSU.

11                 By the time I started in July

12   at least a couple of hundred people had been

13   flagged.  So, I think it started in May or

14   June of 2012.

15        Q.        Are you familiar with the

16   Galaxy system?

17        A.        Yes.

18        Q.        What is the Galaxy system?

19        A.        The Galaxy system is actually a

20   budgetary system that provides table of

21   organization for all DOE offices and

22   schools.

23                 So, it is a budget driven

24   system that basically tracks all current

25   employees by the order by where they work.

1                    DIRECT/RODI

2        Q.        What, if any, involvement do

3   you have with the Galaxy system?

4        A.        As being part of Human

5   Resources, I use the Galaxy system a lot.   To

6   check people's status and then the DSU, the

7   Disciplinary Support project, it linked to

8   Galaxy, but it is not like a part of Galaxy.

9                    JUDGE BLASSMAN:   It is linked

10       to Galaxy?

11                   THE WITNESS:   It is linked to

12       Galaxy.

13       Q.        Are you familiar with the

14   Disciplinary Support Unit flag?

15       A.        Yes, I am.

16       Q.        I know we heard much talk about

17   it.

18                   Can you briefly define for us

19   what the disciplinary support unit flag is?

20       A.        Sure.   The flag is a reflection

21   of what we pulled into the DSU system.   The

22   system is a web based system.

23                   It is set up so that no one can

24   be accidentally or easily flagged.   It is set

25   up so that if I want to kind of open a folder

DIRECT/RODI

1
2    for a person, I have to put in their name or
3    an identifier such as a Social Security
4    number, an employee I.D. and then that
5    person's name would be automatically
6    populated from the Galaxy data.
7                    Once I have the person's
8    information up I can then attach documents to
9    the person's name.
10                   Just attaching a document to a
11   person's name doesn't flag them.  What it has
12   to do it has to meet two qualifications.
13                   Number one, there has to be a
14   substantiated report of discipline issued
15   from an investigatory body.
16                   Then second there has to be a
17   letter of discipline that has been --  that
18   has evidenced that the person received the
19   discipline.
20                   Once both those two factors are
21   met a person is then manually flagged.
22                   So, even if the two documents
23   were both there, unless someone went in there
24   and looked at it, a person couldn't be
25   flagged.  It is not, the system doesn't read

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X  :
                                                                    :
MICHAEL KANE, et al.,                                               :
                                                                    :
                                    Plaintiffs,                     :
                                                                    :     Case No.  21-cv-7863 (VEC) (Lead)
                - against -                                          :
                                                                    :
DE BLASIO et al.,                                                   :
                                                                    :
                                    Defendants.                     :
-------------------------------------------------------------------X  :
                                                                    :
MATTHEW KEIL, et al.                                                :
                                                                    :
                                    Plaintiffs,                     :
                                                                    :     Case No.  21-cv-8773 (VEC)
                - against -                                          :
                                                                    :
THE CITY OF NEW YORK et al.,                                        :
                                                                    :
                                    Defendants.                     :
-------------------------------------------------------------------X

### DECLARATION OF BETSY COMBIER

Betsy Combier declares as follows, pursuant to 28 U.S.C. § 1746:

1.    My name is Betsy Combier and I am the President and lead paralegal of Advocatz, a paralegal consulting business for people who need a partner as they go through the Courts, grievances, or life problems.

2.    I respectfully submit this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

3.    I know the facts stated herein to be true based upon my personal knowledge and based upon my review of the files of hundreds of my clients whom I have represented in proceedings with the New York City Department of Education ("DOE"), except

for statements which are made on information and belief and, as to those, I verily believe them.

4. I have a degree in Child Psychology from Northwestern University, an MA Certificate from the Johns Hopkins' School for Advanced International Studies where my specialization was the Soviet Military Industrial Complex, an MPS in Interactive Telecommunications from New York University, and a Certificate in Art and Drama Therapy from The New School.

5. I have successfully assisted parents, children, and caregivers with the educational needs of their children, and I have been advocating for the due process rights of Union members—in particular, members of the AFL-CIO, United Federation of Teachers ("UFT") and Local 32 B&J—for 17 years.

6. From 2007-2010, I worked as Special Representative to the UFT where my job was to oversee the eight re-assignment centers in the NYC DOE, first in all boroughs, and then at the Manhattan, Brooklyn, and Bronx locations.

7. I am very familiar with the arbitration hearing process, set forth in New York Education Law § 3020-a, having assisted teachers in approximately 300 3020-a hearings since 2003.

8. I am also very familiar with "problem codes"—the flag the DOE puts in the personnel file of employees to indicate that they should not be hired due to unexplained misconduct of some kind. Employees can be flagged for everything from receiving an unsatisfactory or ineffective rating to engaging in egregious criminal acts. During the three years I worked at the UFT headquarters, I received countless calls every week

2

asking me if there was a problem code on an employee's personnel file. When that happened, I would simply ask the person next door to my office, another UFT Special Representative, whether she could check her computer, and she would tell me "yes" or "no" within a minute.

9.      When the DOE puts a problem code in the employee's personnel file, it also places a flag on the employee's fingerprints, which is then sent to the national databases at both the Federal Bureau of Investigation and the State Division of Criminal Justice Services.

10.     I have represented more than 15 DOE employees before the DOE's Office of Personnel Investigation in proceedings in which they requested the removal of their problem codes.  The flag has several names such as "problem code," "pr" code, "pc" code, "ineligible," and "no hire/inquiry" code; however, all refer to a salary block, whatever title it is given.

11.     I have helped approximately 20 DOE employees get their problem codes removed from their personnel files.

12.     I know of many former DOE employees who have problem codes in their personnel files because they declined to be vaccinated in violation of the DOE's mandate and were not granted a religious or medical exemption. The DOE places a problem code on the employee's personnel file immediately upon getting information that the employee did not submit proof of vaccination. As soon as the employee gets the vaccination and submits proof, the code is removed from his or her file.

3

13.   Attached as Exhibit A is a true and correct redacted copy of an email one of my clients received from Eric Amato at the DOE. The email was also sent to UFT Assistant Secretary Michael Sill and copies UFT officials including its General Counsel Beth Norton. The email confirms that DOE employees who were placed on leave without pay for failing to be vaccinated in violation of the DOE's mandate had a problem code (as opposed to any other kind of code) added to their personnel files.

14.   I am aware that non-DOE schools located in counties outside New York City receive funds from the NYC DOE for certain teaching positions. These may include, for example, special education or STEM teachers.

15.   The DOE pays the salaries for these positions using the same system it uses to pay traditional DOE employees, which is called Galaxy. Galaxy indicates whether the employee has a problem code in his or her file and blocks payment to the employee with this flag/code if viewed in the personnel file.

16.   Many of my clients with problem codes in Galaxy have looked for other teaching jobs outside the NYC DOE while their problem code appeals were ongoing.

17.   At least 15 of my clients with problem codes were not hired by prospective schools outside the DOE because such schools saw the problem codes in Galaxy, even though those schools were located outside New York City.

18.   Such schools were able to see the codes because the position applied for was financed by the DOE and so the school used the Galaxy system and could check the prospective employee's file.

19. I also have several clients who applied to schools outside of the DOE who were not hired by their prospective employers because when the prospective employers reached out to the DOE to verify my clients' previous employment, the DOE representative told them about the problem codes in my clients' files.

20. In sum, any non-DOE school that wants to learn whether a former DOE employee has a problem code in his or her personnel file can readily do so.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
      June 3, 2022

                                _Betsy Comb_____
                        By: Betsy Combier

# EXHIBIT A

From: **Amato Eric** <EAmato4@schools.nyc.gov>
Date: Wed, Feb 9, 2022 at 8:06 AM
Subject: RE: PR code
To: ██████████████████████ Michael Sill <msill@uft.org>
Cc: Beth A. Norton
<bnorton@uft.org>, Kking@uft.org <Kking@uft.org>, dcampbell@uft.org <dcampbell@uft.org>

PR = Problem code – Problem code was added to all employees who were placed on 2VM vaccine mandate leave. It was placed there the day you went on the leave. Our central offices placed this code on all employees who went on the leave. It will be removed once you are eligible to return to work.

Thanks,
Eric

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
:
MICHAEL KANE, et al.,                                          :
:
                Plaintiffs,          :
:
        - against -                                 :  Case No.  21-cv-7863 (VEC) (Lead)
:
BILL DE BLASIO, et al.,                                       :
:
                Defendants.        :
-----------------------------------------------------------------X
:
MATTHEW KEIL, et al.                                          :
:
                Plaintiffs,          :
:
        - against -                                 :  Case No.  21-cv-8773 (VEC)
:
THE CITY OF NEW YORK, et al.,                          :
:
                Defendants.        :
-----------------------------------------------------------------X

**DECLARATION OF BARRY BLACK IN FURTHER SUPPORT OF**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**BARRY BLACK**, an attorney admitted to practice before this Court, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true:

1. I am an attorney for Plaintiffs and fully familiar with the facts and circumstances of this case.

2. I respectfully submit this declaration in response to Mallory O. Sullivan's Declaration.

3. Attached as Exhibit 1 is a true and correct copy of a declaration from Betsy Combier.

4. Attached as Exhibit 2 is a true and correct copy of a declaration from Plaintiff Dennis Strk.

5. Attached as Exhibit 3 is a true and correct copy of a declaration from proposed class member Patricia Catoire.

### First False Assertion in Sullivan Declaration

6. The Sullivan Declaration asserts that there are two different kinds of codes in the NYCAPS system: a "problem code" and some other unnamed code, the "problem code" indicating anything from a performance issue to criminal activity, and the unspecified code flagging the absence of vaccination. Glaringly absent from Sullivan's recitation is how these codes appear to the reader. That is because there is no difference; they are one and the same.

7. Indeed, DOE Human Resources Director Eric Amato explicitly stated in an email to UFT Assistant Secretary Michael Sill and General Counsel Beth Norton that a "[p]roblem code was added to all employees who were placed on 2VM vaccine mandate leave. Our central offices placed this code on all employees who went on the leave." Ex. 1, ¶ 13, Ex. A.

8. Moreover, terminated Plaintiffs had a problem code plainly visible in their payroll portal, indicated by a "**Problem** PR" notation in their salary history tab. Ex. 2, ¶ 5, Ex. A; Ex. 1 ¶ 10 (DOE's "problem code" is also referred to as a "pr" code).

1

## **Second False Assertion in Sullivan Declaration**

9. The Sullivan Declaration falsely posits that the no one outside DOE's Office of Personnel Investigations has access to the problem code. To the contrary, any non-DOE school or official that wants to learn whether a former DOE employee has a problem code in his or her personnel file can easily do so in a variety of ways. For example, non-DOE schools which offer DOE-funded positions have access to the DOE's payment portal, Galaxy, which allows them to see problem codes; indeed Plaintiffs present evidence of at least 15 former DOE employees who were not hired at non-DOE schools because the non-DOE schools discovered their problem codes. Ex. 1, ¶¶ 14-18. Simple phone calls work as well: a former UFT Special Representative explained that she used to "receive[] countless calls every week asking . . . if there was a problem code on an employee's personnel file" and that her UFT colleague next door would then check her computer and "tell [her] 'yes' or 'no' within a minute." Ex. 1, ¶ 8. In some instances, DOE representatives disclosed the problem codes to prospective employers from non-DOE schools calling to verify employment. Ex. 1, ¶ 19. In one instance, a third-party HR representative at Bright Start Learning Center of NYC—a non-DOE school operating pursuant to NYS Department of Health Bureau of Early Intervention directives—informed a former DOE employee that she had had been flagged as "ineligible" in her personnel file. Ex. 3, ¶¶ 8-9, 13.

10. It is noteworthy that such evidence was already in the record before Defendants filed the Sullivan declaration, but Defendants did not even attempt to discredit it. ECF No. 162 ¶¶ 11-13 (Plaintiff Solon was told by an official at non-DOE school that it could not hire her because of the problem code in her personnel file).

2

## **Further Evidence of Irreparable Harm**

11. Plaintiffs' irreparable harm did not cease with their terminations. Instead, the problem codes in their files make them unemployable indefinitely at both DOE and non-DOE schools.

12. The UFT has stated unequivocally that such problem codes "will be removed once [they] are eligible to return to work." Ex. 1, ¶ 13, Ex. A.

13. Thus, Plaintiffs face ongoing coercion to violate their religious beliefs and become vaccinated, in order to become employable – and remove the scarlet letter from their permanent records.

14. The Court is reminded that Plaintiff Solon's problem code was removed within 24 hours of her getting vaccinated. ECF No. 162 ¶ 18.

Dated: New York, New York

June 3, 2022                                    Respectfully submitted,

_____
Barry Black
Nelson Madden Black LLP
*Attorney for Plaintiffs*
475 Park Avenue South, Suite 2800
New York, NY 10016
(212) 382-4303



**Department of
Education**

November 18, 2022

Brooklyn, New York

Title: Teacher/
Applicant ID:
PRP#:

Dear Ms.

Your name was recently submitted to the Office of Personnel Investigation (OPI) for security
clearance to work with the NYC Department of Education (DOE) or a DOE contracted vendor.
According to our records, your services with the DOE were terminated due to noncompliance with
the vaccine mandate and you currently appear out of compliance. The purpose of our contact was to
request information so that your application could be processed for security clearance. Requests were
sent to you at the email address you provided          @aol.com' on November 10, 2022 and
November 16, 2022. You were given a deadline to provide the requested information. To date, we
have not received the required information.

Due to your non-compliance, you are unable to work with the DOE or any DOE contracted vendors.
As such, your case has been administratively closed, and no security clearance determination has been
made. Please note that at this time, you do not have security clearance to work with the DOE and/or
one of its contracted vendors.

Sincerely,

The Office of Personnel Investigation
Division of Human Resources
NYC Department of Education

cc: File

From: kking@uft.org >
Date: Thu, Apr 28, 2022 at 12:50 PM
Subject: response from UFT regarding the problem code
>

Karen King (KKing@uft.org)To:you Details
Hello,

Technically you should receive charges. At this time, however, the DOE is not going to issue
3020-a charges because they do not believe they have to do so. We have filed a legal challenge to
protect your due process rights, should the judge decide in our favor, you will be entitled to a
hearing at that time.

The problem code was added to all employees who were placed on 2VM vaccine mandate leave.
It was placed there the day you went on the leave. DOE's central offices placed this code on all
employees who went on the leave. It will be removed once you are eligible to return to work.

**Karen King**
*Administrative Assistant to the Assistant Secretary &*
*Director of Personnel, Payroll, and Special Projects*
United Federation of Teachers
50 Broadway, 13th Floor
New York, N.Y. 10004
*kking@uft.org*

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x

MICHAEL KANE, et al,

                                  Plaintiffs,

          - against –                       21-CV-7863 (VEC) (Lead Case)


BILL DE BLASIO, et al.,

                                    Defendants.

-------------------------------------------------------------- x

MATTHEW KEIL, et al.
                                 Plaintiffs,

          - against -                          21-CV-8773 (VEC)


THE CITY OF NEW YORK, et al.,

                                   Defendants

-------------------------------------------------------------- x

      **MALLORY O. SULLIVAN**, under penalty of perjury, declares pursuant to 28 U.S.C. §

1746, that the following statements are true and correct:

               1.         I am the Deputy Director of the Office of Employee Relations

("OER") at the New York City Department of Education ("DOE"), and I have held this position

since November 2014. Prior to serving in my current position, I was an Agency Attorney with

the DOE's Office of the General Counsel for approximately four years.

              2.         I submit this declaration to provide information about DOE's

employment record system in response to certain allegations regarding "problem codes" as set

forth in the Declaration of Natasha Solon dated May 20, 2022 (ECF dkt. 162). I am familiar

with the facts set forth herein based on my personal knowledge as well as discussions with other DOE employees and the review of DOE records.

3.        In my role as Deputy Director, I oversee the DOE's Office of Personnel Investigation ("OPI"), which is responsible for, among other things, screening and conducting background investigations for all candidates for employment with the DOE or with vendors under contract with the DOE and monitoring employee and vendor employee security clearances. As a part of these processes, OPI uses internal system codes.

4.        The DOE maintains electronic employment records and employee service histories for DOE employees ("DOE employment records"). DOE employment records are kept within a system called NYCAPS, which is operated by the City of New York for all DOE and City employees. DOE employment records are only visible to the DOE and reflect employees' dates of employment, titles held, and various changes in active employment status.

5.        In addition, DOE has codes within NYCAPS designed to engender special attention should an individual seek employment, re-employment, or change titles with the DOE. Such a code might be used where, for example, an employee left DOE employment with a performance issue, had a nomination for employment rescinded, or was the subject of an arrest. This is designed to ensure that prior to any new employment or new title within DOE, the employee's application undergoes further review by OPI. These types of codes have been colloquially referred to as "problem codes." These codes are only visible to internal DOE Human Resources staff, and the underlying basis for such code is only accessible by OPI.

8.        Separately, DOE implemented an internal NYCAPS code specific to the Commissioner of Health Order mandating vaccination of DOE employees ("Vaccination Mandate"). This code remains visible to only OPI staff to ensure vaccination status was

reviewed prior to any return of an employee placed on a leave without pay due to non-compliance with the Vaccination Mandate. A DOE employee would not have a "problem code" in their service history as a result of any non-compliance with the Vaccination Mandate.

9.      In this instant case, Natasha Solon was placed on leave without pay due to non-compliance with the Vaccination Mandate, and returned to service once compliance with the Vaccination Mandate was confirmed. At no point did Natasha Solon have a "problem code" in her service history as a result of her non-compliance with the Vaccination Mandate nor was there ever any code in her service history arising out of her vaccination status visible to anyone outside of OPI.

Dated:      May 27, 2022
            New York, New York

                                    By: _____
                                        Mallory Q. Sullivan
                                        Deputy Director
                                        Office of Employee Relations

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
                                  :

MICHAEL KANE, et al.,                :

                   Plaintiffs,      :

                                 :

        - against -              :     Case No.  21-cv-7863 (VEC) (Lead)

                                 :

BILL DE BLASIO, et al.,         :

                                 :

                 Defendants.    :
------------------------------------------------------------------X
                                  :

MATTHEW KEIL, et al.         :

                                   :

                   Plaintiffs,      :

                                 :

        - against -              :     Case No.  21-cv-8773 (VEC)

                                 :

THE CITY OF NEW YORK, et al.,     :

                                   :

                 Defendants.    :
------------------------------------------------------------------X

**DECLARATION OF BARRY BLACK IN FURTHER SUPPORT OF**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**BARRY BLACK**, an attorney admitted to practice before this Court, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true:

1. I am an attorney for Plaintiffs and fully familiar with the facts and circumstances of this case.

2. I respectfully submit this declaration in response to Mallory O. Sullivan's Declaration.

3. Attached as Exhibit 1 is a true and correct copy of a declaration from Betsy Combier.

4. Attached as Exhibit 2 is a true and correct copy of a declaration from Plaintiff Dennis Strk.

5. Attached as Exhibit 3 is a true and correct copy of a declaration from proposed class member Patricia Catoire.

### First False Assertion in Sullivan Declaration

6. The Sullivan Declaration asserts that there are two different kinds of codes in the NYCAPS system: a "problem code" and some other unnamed code. the "problem code" indicating anything from a performance issue to criminal activity, and the unspecified code flagging the absence of vaccination. Glaringly absent from Sullivan's recitation is how these codes appear to the reader. That is because there is no difference; they are one and the same.

7. Indeed, DOE Human Resources Director Eric Amato explicitly stated in an email to UFT Assistant Secretary Michael Sill and General Counsel Beth Norton that a "[p]roblem code was added to all employees who were placed on 2VM vaccine mandate leave. Our central offices placed this code on all employees who went on the leave." Ex. 1, ¶ 13, Ex. A.

8. Moreover, terminated Plaintiffs had a problem code plainly visible in their payroll portal, indicated by a **"Problem PR"** notation in their salary history tab. Ex. 2, ¶ 5, Ex. A; Ex. 1 ¶ 10 (DOE's "problem code" is also referred to as a "pr" code).

1

**Second False Assertion in Sullivan Declaration**

9. The Sullivan Declaration falsely posits that the no one outside DOE's Office of Personnel Investigations has access to the problem code. To the contrary, any non-DOE school or official that wants to learn whether a former DOE employee has a problem code in his or her personnel file can easily do so in a variety of ways. For example, non-DOE schools which offer DOE-funded positions have access to the DOE's payment portal, Galaxy, which allows them to see problem codes; indeed Plaintiffs present evidence of at least 15 former DOE employees who were not hired at non-DOE schools because the non-DOE schools discovered their problem codes. Ex. 1, ¶¶ 14-18. Simple phone calls work as well: a former UFT Special Representative explained that she used to "receive[] countless calls every week asking . . . if there was a problem code on an employee's personnel file" and that her UFT colleague next door would then check her computer and "tell [her] 'yes' or 'no' within a minute." Ex. 1, ¶ 8. In some instances, DOE representatives disclosed the problem codes to prospective employers from non-DOE schools calling to verify employment. Ex. 1, ¶ 19. In one instance, a third-party HR representative at Bright Start Learning Center of NYC—a non-DOE school operating pursuant to NYS Department of Health Bureau of Early Intervention directives—informed a former DOE employee that she had had been flagged as "ineligible" in her personnel file. Ex. 3, ¶¶ 8-9, 13.

10. It is noteworthy that such evidence was already in the record before Defendants filed the Sullivan declaration, but Defendants did not even attempt to discredit it. ECF No. 162 ¶¶ 11-13 (Plaintiff Solon was told by an official at non-DOE school that it could not hire her because of the problem code in her personnel file).

## Further Evidence of Irreparable Harm

11. Plaintiffs' irreparable harm did not cease with their terminations. Instead, the problem codes in their files make them unemployable indefinitely at both DOE and non-DOE schools.

12. The UFT has stated unequivocally that such problem codes "will be removed once [they] are eligible to return to work." Ex. 1, ¶ 13, Ex. A.

13. Thus, Plaintiffs face ongoing coercion to violate their religious beliefs and become vaccinated, in order to become employable – and remove the scarlet letter from their permanent records.

14. The Court is reminded that Plaintiff Solon's problem code was removed within 24 hours of her getting vaccinated. ECF No. 162 ¶ 18.

Dated: New York, New York

      June 3, 2022                     Respectfully submitted,

                                        Barry Black
                                        Nelson Madden Black LLP
                                        *Attorney for Plaintiffs*
                                        475 Park Avenue South, Suite 2800
                                        New York, NY 10016
                                        (212) 382-4303

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X :
MICHAEL KANE, et al.,                                   :
                                                        :
                                    Plaintiffs,         :
                                                        :
                        - against -                     :    Case No.  21-cv-7863 (VEC) (Lead)
                                                        :
DE BLASIO et al.,                                       :
                                                        :
                                    Defendants.         :
-------------------------------------------------------X :
MATTHEW KEIL, et al.                                    :
                                                        :
                                    Plaintiffs,         :
                                                        :
                        - against -                     :    Case No.  21-cv-8773 (VEC)
                                                        :
THE CITY OF NEW YORK et al.,                            :
                                                        :
                                    Defendants.         :
-------------------------------------------------------X

## DECLARATION OF BETSY COMBIER

Betsy Combier declares as follows, pursuant to 28 U.S.C. § 1746:

1.  My name is Betsy Combier and I am the President and lead paralegal of Advocatz, a paralegal consulting business for people who need a partner as they go through the Courts, grievances, or life problems.

2.  I respectfully submit this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

3.  I know the facts stated herein to be true based upon my personal knowledge and based upon my review of the files of hundreds of my clients whom I have represented in proceedings with the New York City Department of Education ("DOE"), except

1

for statements which are made on information and belief and, as to those, I verily believe them.

4.   I have a degree in Child Psychology from Northwestern University, an MA Certificate from the Johns Hopkins' School for Advanced International Studies where my specialization was the Soviet Military Industrial Complex, an MPS in Interactive Telecommunications from New York University, and a Certificate in Art and Drama Therapy from The New School.

5.   I have successfully assisted parents, children, and caregivers with the educational needs of their children, and I have been advocating for the due process rights of Union members—in particular, members of the AFL-CIO, United Federation of Teachers ("UFT") and Local 32 B&J—for 17 years.

6.   From 2007-2010, I worked as Special Representative to the UFT where my job was to oversee the eight re-assignment centers in the NYC DOE, first in all boroughs, and then at the Manhattan, Brooklyn, and Bronx locations.

7.   I am very familiar with the arbitration hearing process, set forth in New York Education Law § 3020-a, having assisted teachers in approximately 300 3020-a hearings since 2003.

8.   I am also very familiar with "problem codes"—the flag the DOE puts in the personnel file of employees to indicate that they should not be hired due to unexplained misconduct of some kind. Employees can be flagged for everything from receiving an unsatisfactory or ineffective rating to engaging in egregious criminal acts. During the three years I worked at the UFT headquarters, I received countless calls every week

2

asking me if there was a problem code on an employee's personnel file. When that happened, I would simply ask the person next door to my office, another UFT Special Representative, whether she could check her computer, and she would tell me "yes" or "no" within a minute.

9.   When the DOE puts a problem code in the employee's personnel file, it also places a flag on the employee's fingerprints, which is then sent to the national databases at both the Federal Bureau of Investigation and the State Division of Criminal Justice Services.

10.   I have represented more than 15 DOE employees before the DOE's Office of Personnel Investigation in proceedings in which they requested the removal of their problem codes. The flag has several names such as "problem code," "pr" code, "pc" code, "ineligible," and "no hire/inquiry" code; however, all refer to a salary block, whatever title it is given.

11.   I have helped approximately 20 DOE employees get their problem codes removed from their personnel files.

12.   I know of many former DOE employees who have problem codes in their personnel files because they declined to be vaccinated in violation of the DOE's mandate and were not granted a religious or medical exemption. The DOE places a problem code on the employee's personnel file immediately upon getting information that the employee did not submit proof of vaccination. As soon as the employee gets the vaccination and submits proof, the code is removed from his or her file.

13.   Attached as Exhibit A is a true and correct redacted copy of an email one of my clients received from Eric Amato at the DOE. The email was also sent to UFT Assistant Secretary Michael Sill and copies UFT officials including its General Counsel Beth Norton. The email confirms that DOE employees who were placed on leave without pay for failing to be vaccinated in violation of the DOE's mandate had a problem code (as opposed to any other kind of code) added to their personnel files.

14.   I am aware that non-DOE schools located in counties outside New York City receive funds from the NYC DOE for certain teaching positions. These may include, for example, special education or STEM teachers.

15.   The DOE pays the salaries for these positions using the same system it uses to pay traditional DOE employees, which is called Galaxy. Galaxy indicates whether the employee has a problem code in his or her file and blocks payment to the employee with this flag/code if viewed in the personnel file.

16.   Many of my clients with problem codes in Galaxy have looked for other teaching jobs outside the NYC DOE while their problem code appeals were ongoing.

17.   At least 15 of my clients with problem codes were not hired by prospective schools outside the DOE because such schools saw the problem codes in Galaxy, even though those schools were located outside New York City.

18.   Such schools were able to see the codes because the position applied for was financed by the DOE and so the school used the Galaxy system and could check the prospective employee's file.

4

19. I also have several clients who applied to schools outside of the DOE who were not hired by their prospective employers because when the prospective employers reached out to the DOE to verify my clients' previous employment, the DOE representative told them about the problem codes in my clients' files.

20. In sum, any non-DOE school that wants to learn whether a former DOE employee has a problem code in his or her personnel file can readily do so.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
     June 3, 2022

                                     *Betsy Combier*
                          By: Betsy Combier

5

# EXHIBIT A

From: **Amato Eric** <EAmato4@schools.nyc.gov>
Date: Wed, Feb 9, 2022 at 8:06 AM
Subject: RE: PR code
To: ███████████████████    Michael Sill <msill@uft.org>
Cc: Beth A. Norton
<bnorton@uft.org>, Kking@uft.org <Kking@uft.org>. dcampbell@uft.org <dcampbell@uft.org>


PR = Problem code – Problem code was added to all employees who were placed on 2VM vaccine mandate leave. It was placed there the day you went on the leave. Our central offices placed this code on all employees who went on the leave. It will be removed once you are eligible to return to work.


Thanks,
Eric

5. In October, 2021, I was involuntarily suspended for failing to get vaccinated in violation of my sincerely held religious beliefs.

6. After the Second Circuit held that the DOE's religious exemption policy was unconstitutional, I was able to apply for reconsideration by the Citywide Panel. The email sent to me stated that we did not need to submit anything because they would rely on the original material.

7. I received no response for months. Meanwhile my situation became desperate.

8. I depleted all of my savings, my son had to take a leave of absence from school because I could not pay the parental portion of tuition, and my children and I were running out of food, and on the brink of losing our home.

9. I owed over $2,000 in heating bills.

10. I applied to over sixty jobs during this period. Despite my extensive qualifications and spotless record, few positions called me back, and none offered me a job.

11. Finally, during an interview in Westchester, the woman conducting the interview took pity on me. She told me she liked me and wished she could hire me.

12. However, she said she had to be honest with me – neither she nor anyone else would be able to hire me.

13. I asked why. She said that there was a "problem" code in the system flagging my name. Outside schools cannot see the reason for the code, other than there is a problem flagged indicating not to hire. Examples she gave me of typical problem codes arose from robbery and other serious misconduct.

14. I have a spotless record and was shocked to find out about this code.

15. I investigated further and learned that the internal records at the DOE showed the reason for the problem code was that I was not vaccinated.

16. My situation grew more desperate every day, and it soon became clear that I would get no other work while this code remains.

17. Finally, to save my family and our home, I took the vaccine, which is against my sincerely held religious beliefs.

18. Within twenty-four hours of submitting my paperwork to the DOE, I was reinstated, and the problem code was removed.

19. Even though I felt I had no choice, this decision has been deeply traumatic and continues to cause irreparable harm.

20. I pray every day for help to overcome my anger, pain, and guilt for having to violate my faith.

21. The experience continues to impact me and to cause me serious distress.

22. I do not feel safe at my job. I do not feel safe in society.

23. The fact that the courts would continue to uphold this brazen unconstitutional condition and fail to intervene to protect us as we lose everything we have worked so hard to achieve continues to shake my faith in this country.

24. If, as the Second Circuit admitted, the DOE violated the Constitution, how can this Court or any other continue to allow the DOE to continue to harm so many of us for not taking the vaccine?

25. I am vaccinated now, but when the inevitable booster requirement comes, I will have to go through all of this again. I do not think that I can violate my faith again. The harm it caused me to do it to save my family was too severe.

26. I only hope that this Court intervenes before that occurs, or at least intervenes before more of my colleagues are forced to be violated the way I was.

27. This is spiritual rape. There is no other way to put it. I did not consent to this.

28. This Court must help us to stop the continuing injustice.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:      New York, New York
            May 20, 2022

                                        By: Natasha Solon

From: **Beth A. Norton** <BNorton@uft.org>
Date: Thu, Jul 28, 2022, 12:36 PM
Subject: RE: Questions about voluntary resignations and follow ups
To:
Cc: Michael Sill <MSill@uft.org>, Michael Mulgrew <MMulgrew@uft.org>, Tanisha
Franks <TFranks@uft.org>, Karen King <KKing@uft.org>

The arbitration award doesn't "expire," I am not sure what you mean by that.

As the language you quoted from the waiver indicates, you will be deemed to have voluntarily resigned your position with the DOE on September 6 if you are not, at that time, in compliance with the health order (vaccinated with 2 shots of Pfizer or Moderna, or 1 shot of J&J). This will be treated as a traditional resignation, it is not a termination. You will be permitted to cash out your CAR and vacation days at the contractual rates. The code on your file indicates that you are not vaccinated, that will not be lifted until such time as you are vaccinated.

You should be receiving an email from the DOE in the next week or so asking for your intent for the fall.

At this time there is no indication that the vaccine mandate will be lifted, so if you wish to return you would have to comply with the health order. If that changes we will let you know.

Regards,

**Beth A. Norton**
General Counsel
United Federation of Teachers
52 Broadway 14th Floor
New York, NY 10004
212-701-9420

# TEACHER VACANCY CIRCULAR NO 4 CENTRAL REMOTE TEACHERS iZONE 2022 2023

NYC Department of Education
3.93.9 out of 5 stars
Remote
Full-time

## Location

Remote

## Full job description

## TEACHER VACANCY CIRCULAR NO 4 CENTRAL REMOTE TEACHERS iZONE 2022 2023

Posted Date: May 6, 2022 Deadline: Jun 3, 2022
New York United States
VIRTUAL

## Job Details

**(SUBJECT TO BUDGET AVAILABILITY)**

**POSITION:**

## Teacher - Central

Remote Instruction Teachers

**License/Eligibility Requirements:**

New York City licensed Social Studies, Science, English, Foreign Language, Math and Health tenured teachers in High School Grade Levels.

**Office:**

iZone

**Location:**

82-01 Rockaway Blvd, Ozone Park, NY 11416

Or other DOE offices

**Remote Teachers**

**Position Summary:**

Virtual Learning Classrooms aim to partner teachers from around the city with students to provide them with increased access to courses not available in their home schools, including, but not limited to Electives, AP Courses, and Foreign Language courses. This posting is for teachers interested in teaching in this full time program from September 2022 - June 2023. Remote instruction teachers will deliver instruction to and communicate with high school students in other locations using internet and required technological platforms. Please note that while students will not be in the same location as the teacher, this is an in person teaching position.

Remote Teachers are licensed teachers of high school grade levels who teach students virtually. Remote teachers will teach students in the following subject areas: Advanced Placement Subjects (Including but not limited to, AP Psychology, AP Spanish, AP US History, AP World History, AP Government, AP Calculus AB/BC, AP Macroeconomics, AP Statistics, AP Computer Science Principles and A, AP Environmental Science, AP English Language and Literature, and AP Seminar), electives (Including but not limited to, Forensics, Health, Media Literacy, Financial Literacy, science electives, Computer Science and Business) and Foreign Languages (Including but not limited to, Spanish, Chinese and French). Other subjects may be added. Students may be enrolled from multiple schools simultaneously, but total class size will not exceed contractual limits. Remote Teachers will be expected to participate in 10 sessions of professional learning workshops including an online course leading to a Learning Management System certification to occur during July and/or August prior to commencement of position with remaining

on-going professional learning during the year and will be paid at the per session rate for work beyond the contractual workday/work year. Remote teachers will perform required duties (including corresponding with home school staff, planning for remote instruction and assessment, communication and conferencing with students and/or parents). Duties and responsibilities are intended to emulate traditional teaching paradigms and create an equitable learning experience.

**Reports to:**

DIIT iZone Supervisor

**QUALIFICATIONS:**

- Minimum of four (4) years of teaching experience as a regularly appointed teacher. Knowledge of the common core standards as it relates to course.

- Extensive knowledge of the New York State and City Standards, meets Advanced Placement requirements (as appropriate) and is licensed in subject matter.

- Demonstrated expertise in an online learning environment designing and implementing standards-based instruction that specifies clear learning objectives, includes engaging activities and authentic assessments to measure mastery.

- Willingness to promote online dialogue to deepen the learning experience.

- Demonstrated ability with written and oral communications emphasis placed on the delivery of digital presentations.

- Demonstrated ability to use online learning, communication and other edtech tools as appropriate.

- Can differentiate instruction for individuals or groups of students based on instructional data and analysis as well as student characteristics.

- Can sustain and document flexible teaching schedules, which account for asynchronous and synchronous activities that are student-centered and maintain high standards for student engagement and success.

- Selected candidates will be asked to facilitate a demonstration lesson or planning activity to demonstrate aforementioned qualifications.

**PREFERRED SKILLS:**

- Demonstrated skill in team building, group dynamics, and facilitating collaborative learning.
- Proven history of being a self-starter who works well without constant supervision.

**DUTIES AND RESPONSIBILITIES:**

- Demonstrate competency in using data from assessments and other data sources to modify content and guide student learning.

- Modify engaging content and appropriate assessments in an online environment.

- Provide quality instruction to students using asynchronous and synchronous teaching methods (I.e. asynchronous = discussion forums, group work, written and digital assignments, posted content. Synchronous = online classrooms, webinars, chat rooms).

- Employ student-centered instructional strategies that are connected to real-world applications to engage students in learning.

- Facilitate and monitor online instruction groups/discussions to promote learning through higher-order thinking and group interaction.

- Provide a variety of ongoing and frequent teacher-student, teacher-teacher, and teacher-administrator interaction with participating schools.

- Provide prompt feedback, communicate high expectations, and teach to diverse talents and learning styles.

- Online communication between students and teachers is a significant component of this program to mimic in person communication. Therefore, teachers are expected to respond to student emails and grade assignments within 2 workdays, as well as monitor and respond to discussion postings daily during the school week.

- Regularly share with home school(s) student data including but not limited to grades and attendance. This includes the use of school selected platforms and systems.

- Incorporate and comply with FERPA, AUP and communicate privacy guidelines to students.

- Select and use a variety of online tools for communication, productivity, collaboration, data and performance analysis, presentation, research, and online content delivery as appropriate to the content area and student needs.

- Use communication technologies in a variety of mediums and contexts for teaching and learning.

- Apply technical troubleshooting skills (downloading plug-ins, uploading assignments, etc.)

- Participate in all professional development and peer mentoring exercises throughout the duration of service.

- Develop key relationships in order to work closely with home school staff, students and parents of participating schools, guidance counselors and central iZone staff.

- Participate in activities to identify best practices, address challenges and assess efficacy.

**WORKING CONDITIONS & LOCATION:**

- The maximum class size of a full virtual course not exceed UFT contractual limits.

- Teachers shall not be assigned more than twenty five (25) teaching periods per week and may teach up to five (5) remote classes; however, the maximum number of distinct courses shall not exceed three (3).

- Teachers must confer with students synchronously during programmed periods each week, as well as be available for asynchronous teaching approaches including but not limited to office hours, individual and small group conferencing and providing direction for independent student

work. Facilitate learning through supplied curriculum that teachers may supplement.

- Teachers are expected to teach in person from 82-01 Rockaway Blvd, Ozone Park, NY 11416 or other DOE office.

**Hours:**

As per Article Six of the Collective Bargaining Agreement

**Salary:**

As per UFT Contract

**Work Year:**

As per Article Six of the Collective Bargaining Agreement

**APPLICATION INSTRUCTIONS:**

Please be sure application includes cover letter, resume and your 6-digit file number.

Please send application via email to the following email address: iLearnNYC@schools.nyc.gov with the Subject line: "Fulltime Remote Teacher application."

Applications will be accepted through:

# JUNE 3, 2022

# An Equal Opportunity Employer M/F/D

It is the policy of the Department of Education of the City of New York to provide equal employment opportunities without regard to actual or perceived race, color, religion, creed, ethnicity, national origin, alienage, citizenship status, age, marital status, partnership status, disability, sexual orientation, gender(sex), military status, unemployment status, caregiver status, consumer credit history, prior record of arrest or conviction(except as permitted by law), predisposing genetic characteristics, or status as a victim of domestic violence, sexual offenses and stalking, and to maintain an environment free of harassment on any of the above - noted grounds, including sexual

harassment or retaliation. For more information, please refer to the DOE Non -Discrimination Policy.

 

**September 13th, 2021**

**To whom it may concern,**

**My name is R     F.     , my employee ID is #.......  I have been employed with the NYCDOE for 20 years now.  I am extremely proud of all the work I've done with the communities of the Bronx that I've had the privilege of working with.  I am currently an Assistant Principal with Frederick Douglas Academy V in the Bronx.**

**"Religious liberty is a foundational principle of enduring importance in America enshrined in our Constitution and other sources of Federal law."**   I know that the law in this Country allows for personal religious beliefs and that's what makes me so proud to be an American, where my beliefs and freedoms are protected.  I get to work in a city that is literally called the Melting Pot of the Country.  It is filled with all different cultures and religions and we can live together respecting and encouraging one another's differences.

My faith, and religious journey is the most important thing in my life.  I am a devout Christian; my life is led by the Holy Spirit that lives inside of me.  It is my religious belief that my God is my healer and I put all my faith and hope in Him.  It is my religious belief that it is a complete betrayal of faith to put my hope and faith in any vaccine to keep my body healthy.  My God will heal me and my family.  We have all contracted covid and He kept us all, safe and whole.

Any blood that may be in any vaccines is sacrilegious and I cannot allow my body to be corrupted or made unclean.  1 Corinthians 3:17 "If anyone destroys God's temple, God will destroy that person; for God's temple is sacred, and you together are that temple".  Exodus 15:26 "I am the Lord that heals you."  Fetal cells that may be used in creating this vaccine, goes against my stance on abortion.  As a Christian I am against murder.  Exodus 20:13 "You shall not murder."  Therefore, taking this vaccine will desecrate my body.  Even though I have been fully vaccinated in my childhood, that choice was performed by the choices of my non-religious parents, whom I loved dearly.  As an adult, husband and father, I choose to live out my life through God's command from His Holy word, the Bible.

My faith and relationship in God are what helps guide my life and helps me discern what is needed to keep my body in line with the Word of God.  I am created in the image of God.  My body/blood is a sacred being and must remain pure in the sight of God.  Taking this vaccine or any other vaccine for that matter would go against everything I believe and base my life upon.

I ask that you please keep this confidential, I am only sharing these personal things so you could have a better understanding of my declination of this vaccine due to my religious beliefs.  Please understand my convictions.  Thank you for your time and consideration.

Sincerely,

R.     F

# 94

EXHIBIT
3

THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, N.Y. 10007

EMERGENCY EXECUTIVE ORDER NO. 62

March 24, 2022

WHEREAS, the COVID-19 pandemic has severely impacted New York City and its economy, and is addressed effectively only by joint action of the City, State, and Federal governments; and

WHEREAS, the state of emergency to address the threat and impacts of COVID-19 in the City of New York first declared in Emergency Executive Order No. 98, issued on March 12, 2020, and extended most recently by Emergency Executive Order No. 46, issued on February 28, 2022, remains in effect; and

WHEREAS, this Order is given because of the propensity of the virus to spread person-to-person, and also because the actions taken to prevent such spread have led to property loss and damage; and

WHEREAS, athletes and performing artists frequently conduct their work at venues both inside and outside of the City, without regard to their residence in the City, and their work benefits the City's economic recovery from the pandemic, often attracting large numbers of visitors to the City; and

WHEREAS, New York City athletic teams have been, and continue to be, at a competitive disadvantage because visiting teams can field unvaccinated players, and this competitive disadvantage has negatively impacted, and continues to negatively impact, New York City teams' success, which is important to the City's economic recovery and the morale of City residents and visitors; and

WHEREAS, additional reasons for requiring the measures continued in this Order are set forth in my prior Emergency Executive Order No. 50, issued on March 4, 2022;

NOW, THEREFORE, pursuant to the powers vested in me by the laws of the State of New York and the City of New York, including but not limited to the New York Executive Law, the New York City Charter and the Administrative Code of the City of New York, and the common law authority to protect the public in the event of an emergency:

Section 1. I hereby direct that section 1 of Emergency Executive Order No. 59, dated March 19, 2022, is extended for five (5) days.

FILED: RICHMOND COUNTY CLERK 07/20/2022 03:32 PM

NYSCEF DOC. NO. 7

INDEX NO. 85163/2022

RECEIVED NYSCEF: 07/20/2022

§ 2. I hereby order that section 3 of Emergency Executive Order No. 50, dated March 4, 2022, is amended to read as follows.

§ 3. I hereby direct that:

a. Covered entities that had been covered by the Key to NYC program shall continue to require that a covered worker provide proof of vaccination, unless such worker has received a reasonable accommodation. Covered entities shall continue to keep a written record of their protocol for checking covered workers' proof of vaccination and to maintain records of such workers' proof of vaccination, as described in subdivisions d and e of section 2 of Emergency Executive Order No. 317, dated December 15, 2021.

b. Records created or maintained pursuant to subdivision a of this section shall be treated as confidential.

c. A covered entity shall, upon request by a City agency, make available for inspection the records required to be maintained by this section, consistent with applicable law.

d. For the purposes of this Section:

(1) "Covered entity" means any entity that operates one or more "covered premises," except that "covered entity" does not include pre-kindergarten through grade twelve (12) public and non-public schools and programs, houses of worship, childcare programs, senior centers, community centers.

(2) "Covered premises" means any of the following locations, except as provided in subparagraph (iv) of this paragraph:

 **(i) Indoor Entertainment and Recreational Settings, and Certain Event and Meeting Spaces**, including indoor portions of the following locations, regardless of the activity at such locations: movie theaters, music or concert venues, adult entertainment, casinos, botanical gardens, commercial event and party venues, museums, aquariums, zoos, professional sports arenas and indoor stadiums, convention centers and exhibition halls, hotel meeting and event spaces, performing arts theaters, bowling alleys, arcades, indoor play areas, pool and billiard halls, and other recreational game centers;

 **(ii) Indoor Food Services**, including indoor portions of food service establishments offering food and drink, including all indoor dining areas of food service establishments that receive letter grades as described in section 81.51 of the Health Code; businesses operating indoor seating areas of food courts; catering food service establishments that provide food indoors on its premises; and any indoor portions of an establishment that is regulated by the New York State Department of Agriculture and Markets offering food for on-premises indoor consumption; and

2

**FILED: RICHMOND COUNTY CLERK 07/20/2022 03:32 PM**

NYSCEF DOC. NO. 7

INDEX NO. 85163/2022

RECEIVED NYSCEF: 07/20/2022

**(iii) Indoor Gyms and Fitness Settings**, including indoor portions of standalone and hotel gyms and fitness centers, gyms and fitness centers in higher education institutions, yoga/Pilates/barre/dance studios, boxing/kickboxing gyms, fitness boot camps, indoor pools, CrossFit or other plyometric boxes, and other facilities used for conducting group fitness classes.

(iv) "Covered premises" does not include houses of worship or locations in a residential or office building the use of which is limited to residents, owners, or tenants of that building.

(3) "Covered worker" means an individual who works in-person in the presence of another worker or a member of the public at a workplace in New York City. "Covered worker" includes a full- or part-time staff member, employer, employee, intern, volunteer, or contractor of a covered entity, as well as a self-employed individual or a sole practitioner.

"Covered worker" does not include:

(i) an individual who works from their own home and whose employment does not involve interacting in-person with co-workers or members of the public;

(ii) an individual who enters the workplace for a quick and limited purpose;

(iii) a performing artist, or an individual accompanying such performing artist, while the performing artist is in a covered premises for the purpose of such artist's performance; or

(iv) a professional athlete, or an individual accompanying such professional athlete or such athlete's sports team, who enters a covered premises as part of their regular employment.

(4) "Proof of vaccination" means proof of receipt of a full regimen of a COVID-19 vaccine authorized for emergency use or licensed for use by the U.S. Food and Drug Administration or authorized for emergency use by the World Health Organization, not including any additional recommended booster doses. Such proof may be established by:

(i) A CDC COVID-19 Vaccination Record Card or an official immunization record from the jurisdiction, state, or country where the vaccine was administered, or a digital or physical photo of such a card or record, reflecting the person's name, vaccine brand, and date administered; or

(ii) A New York City COVID Safe App (available to download on Apple and Android smartphone devices); or

(iii) A New York State Excelsior Pass; or

(iv) CLEAR's digital vaccine card; or

3

FILED: RICHMOND COUNTY CLERK 07/20/2022 03:32 PM

NYSCEF DOC. NO. 7

INDEX NO. 85163/2022

RECEIVED NYSCEF: 07/20/2022

(v) Any other method specified by the Commissioner of Health and Mental Hygiene as sufficient to demonstrate proof of vaccination.

(5) I hereby order that section 20-1271 of the Administrative Code of the City of New York is modified by adding the following provision to the definition of "just cause:" Notwithstanding any provision of this chapter, a fast food employer shall be deemed to have just cause when a fast food employee has failed to provide proof of vaccination required by an emergency executive order issued in response to the COVID-19 pandemic and shall not be required to follow progressive discipline procedures prior to terminating the employee, provided that the employee shall have 30 days from the date when the employer notified the employee of the requirement to submit such proof and the employee shall be placed on leave following such notification until such proof is provided. This provision shall not excuse the employer from the responsibility to provide a reasonable accommodation where required by law.

e. An individual who meets the requirements of subparagraph (iii) or (iv) of section 3(d)(3) of this Order shall be exempt from the Order of the Commissioner of Health dated December 13, 2021, relating to requiring COVID-19 vaccination in the workplace.

§ 3. I hereby direct the Fire and Police Departments, the Department of Buildings, the Sheriff, and other agencies as needed, to enforce the directives set forth in this Order in accordance with their lawful authorities, including Administrative Code sections 15-227(a), 28-105.10.1, and 28-201.1, and section 107.6 of the Fire Code. Violations of the directives set forth in this Order may be issued as if they were violations under Health Code sections 3.07 and 3.11, and enforced by the Department of Health and Mental Hygiene or any other agency.

§ 4. This Emergency Executive Order shall take effect immediately and shall remain in effect for five (5) days unless it is terminated or modified at an earlier date.

Eric Adams
Mayor

**Notice of Leave Without Pay - PLEASE READ**

NYCDOE <noreply@schools.nyc.gov>

Sat 10/2/2021 3:10 PM

To: ⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚ @schools.nyc.gov>



Dear ⬚⬚⬚⬚⬚⬚,

You are receiving this message because **you are being placed on a Leave Without Pay (LWOP) because you are not in compliance with the DOE's <u>COVID-19 Vaccine Mandate</u>.** If you are a substitute or in certain titles you have been placed in another inactive status, not a LWOP. **This means you must <u>not</u> report to your work or school site beginning Monday, October 4th.**

While you are on Leave Without Pay (LWOP), you:

- Cannot work and will not receive compensation, but you will continue your medical benefits
- Cannot use annual leave, CAR or sick time
- Cannot enter your work or school site
- Cannot reach out to students or families

In order to return from LWOP status, you must complete two steps using the **<u>DOE Vaccination Portal</u>**

1. Upload proof that you have received your first dose of a COVID-19 vaccine. **Proof of COVID-19 Vaccine can be an image of your vaccination card, NYS Excelsior Pass, or another government record**
2. E-sign the attestation stating that you are willing to return to your worksite within seven calendar days of submission.

Once you have completed these two steps, your HR Director and supervisor will also be notified and will work with you to plan your return date.

**If you have been vaccinated this weekend and upload this information by Monday morning, you may report to work as usual on Monday, October 4th, and you will be put back on active status.**

On Monday, October 4th, if you have an acceptable proof of vaccination (e.g., vaccination card, NY State Excelsior pass, or other government record) but have not been able to upload to the **<u>DOE Vaccination Portal</u>**, you may show your proof to the School Safety Agent and/or Principal (or designee) at the door. You will be allowed in the building, and you must immediately upload proof of vaccination to the Vaccination Portal and confirm that you would like to return to work in order to ensure there is no break in payroll.

If you encounter technical issues accessing the Vaccination Portal, please contact the DOE Help Desk by <u>opening a ticket online</u> or calling 718-935-5100. If you need support uploading your proof of vaccination, please contact your principal or HRD who can do so on your behalf.

Please be advised that if you do not intend to return to the DOE after October 1, 2021, you will need to return all DOE property, including computers, IDs, blackberries, and keys, immediately. Failure to return any DOE property that has been assigned to you will delay the processing of your final payment and any payout of leave time.

Employees represented by UFT or CSA who have been placed on LWOP due to vaccination status may select (in SOLAS) special separation or leave options per the arbitration award:

- **Separation with benefits** (available in SOLAS as of Monday, October 4)**:** Employees choosing to separate under this option:
    - **Must share their intention to separate via SOLAS by October 29, 2021.**
    - Will be required to waive their rights to challenge the involuntary resignation, including, but not limited to, through a contractual or statutory disciplinary process
    - Will be eligible to be reimbursed for unused CAR/sick leave on a one-for-one basis at the rate of 1/200th of the employee's salary at departure per day, up to 100 days, to be paid out following the employee's separation
    - Will be eligible to maintain health insurance through September 5, 2022, unless they have health insurance available from another source.
- **Extend the leave without pay due to vaccination status through September 5, 2022** (available in SOLAS as of Monday, November 1 through November 30, 2021):
    - Employees choosing this option will also be required to waive their rights to challenge their involuntary resignation, including, but not limited to, through a contractual or statutory discipline process
    - They will remain eligible for health insurance through September 5, 2022
    - Employees who have not returned by September 5, 2022 shall be deemed to have voluntarily resigned
- Beginning December 1, 2021, the DOE will seek to unilaterally separate employees who have not selected one of the options above or otherwise separated service.

For more information about where to get vaccinated, visit vaccinefinder.nyc.gov or call 877-VAX-4-NYC. For the latest COVID-19 staffing updates, please visit the Coronavirus Staff Update InfoHub page.

Sincerely,

NYCDOE Division of Human Capital

## Re: Your Pending Appeal for An Exemption to the COVID-19 Vaccine Mandate

Comack Kathleen <KComack@schools.nyc.gov>

Sun 10/3/2021 8:25 PM

To:Leddy Peter <PLeddy@schools.nyc.gov>

Thank you .

Get Outlook for iOS

---

**From:** Leddy Peter <PLeddy@schools.nyc.gov>
**Sent:** Sunday, October 3, 2021 10:42:20 AM
**To:** Comack Kathleen <KComack@schools.nyc.gov>
**Subject:** Re: Your Pending Appeal for An Exemption to the COVID-19 Vaccine Mandate

Ms. Comack,
I bring your attention to paragraph 4 of the email sent to you. This is a Central Administration NYC DOE determination, not a school-based decision.

If your appeal is granted (approved) and you remain unvaccinated, you will not be put on a Leave Without Pay status. **If your usual place of work is in a school, you will receive a new assignment outside of a school building (e.g. administrative offices) to perform academic or administrative work determined by the DOE.** A notification of this assignment may take a few days and in the interim you should temporarily work offsite to transition your work and support related activities. During this time, you should be available during regular work hours and check-in with your school's payroll secretary for timekeeping purposes. If your usual place of work is not in a school building, you should continue to report to your regular location and assignment unless notified otherwise.


Peter Leddy
Principal
The Susan B. Anthony Academy, I.S. 238
www.twitter.com/IS238SBA
www.facebook.com/IS238SBA
https://www.instagram.com/is238sba/
88-15 182nd Street
Hollis, NY 11423
(718) 297-9821
*"True heroism is remarkably sober, very undramatic. It is not the urge to surpass all others at whatever cost, but the urge to serve others at whatever cost." - Arthur Ashe*

---

**From:** Comack Kathleen <KComack@schools.nyc.gov>
**Sent:** Sunday, October 3, 2021 8:35 AM
**To:** Leddy Peter <PLeddy@schools.nyc.gov>
**Subject:** Fwd: Your Pending Appeal for An Exemption to the COVID-19 Vaccine Mandate

Dear Mr Leddy,

NEW YORK CITY DEPARTMENT OF EDUCATION          X          Re: UFT.542

X

and                                            X

JEAN JEAN                                      X

X

------------------------------------------------ X

Issue:          _Religious Exemption_____

Date of Hearing: _____

### Award

APPLICATION FOR EXEMPTION:  GRANTED [ ]    DENIED [X]    OTHER [ ]

_____

_____

_____

_____

_____

_____

_____

9/24/2021

Date

SCHEINMAN ARBITRATION AND MEDIATION SERVICES
------------------------------------------------ X
In the Matter of the Arbitration

                                                 X

                    between
                                                 X

NEW YORK CITY DEPARTMENT OF EDUCATION                    Re: UFT.1252

                                                 X

                    and
                                                 X

Kathleen Comack
                                                 X

------------------------------------------------ X


Issue:    Medical Exemption
_____


Date of Hearing: October 5, 2021
        _____


                            **AWARD**

APPLICATION FOR EXEMPTION: GRANTED [ ]   DENIED [✔]   OTHER [ ]

_____


_____


_____        _____
Carol M. Hoffman, Esq.          Date: Oct.5,2021

Arbitrator

ORDER OF THE COMMISSIONER
OF HEALTH AND MENTAL HYGIENE
TO REQUIRE COVID-19 VACCINATION FOR
DEPARTMENT OF EDUCATION
EMPLOYEES, CONTRACTORS, VISITORS, AND OTHERS

**WHEREAS**, on March 12, 2020, Mayor Bill de Blasio issued Emergency Executive Order No. 98 declaring a state of emergency in the City to address the threat posed by COVID-19 to the health and welfare of City residents, and such order remains in effect; and

**WHEREAS**, on March 25, 2020, the New York City Commissioner of Health and Mental Hygiene declared the existence of a public health emergency within the City to address the continuing threat posed by COVID-19 to the health and welfare of City residents, and such declaration and public health emergency continue to be in effect; and

**WHEREAS**, pursuant to Section 558 of the New York City Charter (the "Charter"), the Board of Health may embrace in the Health Code all matters and subjects to which the power and authority of the Department of Health and Mental Hygiene (the "Department") extends; and

**WHEREAS**, pursuant to Section 556 of the Charter and Section 3.01(c) of the Health Code, the Department is authorized to supervise the control of communicable diseases and conditions hazardous to life and health and take such actions as may be necessary to assure the maintenance of the protection of public health; and

**WHEREAS**, the U.S. Centers for Disease Control and Prevention ("CDC") reports that new variants of COVID-19, identified as "variants of concern" have emerged in the United States, and some of these new variants which currently account for the majority of COVID-19 cases sequenced in New York City, are more transmissible than earlier variants; and

**WHEREAS,** the CDC has stated that vaccination is an effective tool to prevent the spread of COVID-19 and benefits both vaccine recipients and those they come into contact with, including persons who for reasons of age, health, or other conditions cannot themselves be vaccinated; and

**WHEREAS,** the CDC has recommended that school teachers and staff be "vaccinated as soon as possible" because vaccination is "the most critical strategy to help schools safely resume full operations [and] is the leading public health prevention strategy to end the COVID-19 pandemic;" and

**WHEREAS,** on September 9, 2021, President Joseph Biden announced that staff who work in Head Start programs and in schools run by the Bureau of Indian Affairs and Department of Defense will be required to be vaccinated in order to implement the CDC's recommendations; and

**WHEREAS**, on August 26, 2021, New York State Department of Health adopted emergency regulations requiring staff of inpatient hospitals and nursing homes to receive the first dose of a vaccine by September 27, 2021, and staff of diagnostic and treatment centers, hospices, home care and adult care facilities to receive the first dose of a vaccine by October 7, 2021; and

**WHEREAS,** Section 17-104 of the Administrative Code of the City of New York directs the Department to adopt prompt and effective measures to prevent the communication of infectious diseases such as COVID-19, and in accordance with Section 17-109(b), the Department may adopt

vaccination measures to effectively prevent the spread of communicable diseases; and

**WHEREAS,** the City is committed to safe, in-person learning in all pre-school to grade 12 schools, following public health science; and

**WHEREAS** the New York City Department of Education ("DOE") serves approximately 1 million students across the City, including students in the communities that have been disproportionately affected by the COVID-19 pandemic and students who are too young to be eligible to be vaccinated; and

**WHEREAS**, a system of vaccination for individuals working in school settings, including DOE buildings and charter school buildings, will potentially save lives, protect public health, and promote public safety; and

**WHEREAS,** pursuant to Section 3.01(d) of the Health Code, I am authorized to issue orders and take actions that I deem necessary for the health and safety of the City and its residents when urgent public health action is necessary to protect the public health against an existing threat and a public health emergency has been declared pursuant to such section; and

**WHEREAS,** on August 24, 2021, I issued an order requiring COVID-19 vaccination for DOE employees, contractors, and others who work in-person in a DOE school setting or DOE building, which was amended on September 12, 2021; and

**WHEREAS**, unvaccinated visitors to public school settings could spread COVID-19 to students and such individuals are often present in public school settings and DOE buildings;

**NOW THEREFORE** I, Dave A. Chokshi, MD, MSc, Commissioner of Health and Mental Hygiene, finding that a public health emergency within New York City continues, and that it is necessary for the health and safety of the City and its residents, do hereby exercise the power of the Board of Health to prevent, mitigate, control and abate the current emergency, to

**RESCIND and RESTATE** my September 12, 2021 Order relating to COVID-19 vaccination for DOE employees, contractors, visitors, and others; and

I hereby order that:

1. No later than September 27, 2021, or prior to beginning employment, the following individuals must provide proof of vaccination as described below:
   a. DOE staff must provide proof of vaccination to the DOE.
   b. City employees who work in-person in a DOE school setting, DOE building, or charter school setting must provide proof of vaccination to their employer.
   c. Staff of contractors of DOE or the City, as defined below, must provide proof of vaccination to their employer, or if self-employed, to the DOE.
   d. Staff of any charter school serving students up to grade 12, and staff of contractors hired by charter schools co-located in a DOE school setting to work in person in a DOE school setting or DOE building, must provide proof of vaccination to their employer, or if self-employed, to the contracting charter school.

2.  An employer to whom staff must submit proof of vaccination status, must securely maintain a record of such submission, either electronically or on paper, and must demonstrate proof of compliance with this Order, including making such records immediately available to the Department upon request.

3.  Beginning September 13, 2021, all visitors to a DOE school building must show prior to entering the building that they have:
    a.  Been fully vaccinated; or
    b.  Received a single dose vaccine, or the second dose of a two-dose vaccine, even if two weeks have not passed since they received the dose; or
    c.  Received the first dose of a two-dose vaccine.

4.  Public meetings and hearings held in a DOE school building must offer individuals the opportunity to participate remotely in accordance with Part E of Chapter 417 of the Laws of 2021.

5.  For the purposes of this Order:

    "Charter school setting" means a building or portion of building where a charter school provides instruction to students in pre-kindergarten through grade 12 that is not collocated in a DOE building.

    "DOE school setting" includes any indoor location where instruction is provided to DOE students in public school pre-kindergarten through grade 12, including but not limited to locations in DOE buildings, and including residences of students receiving home instruction and places where care for children is provided through DOE's LYFE program. DOE school settings include buildings where DOE and charter schools are co-located.

    "DOE staff" means (i) full or part-time employees of the DOE, and (ii) DOE interns (including student teachers) and volunteers.

    "Fully vaccinated" means at least two weeks have passed after an individual received a single dose of a COVID-19 vaccine that only requires one dose, or the second dose of a two-dose series of a COVID-19 vaccine approved or authorized for use by the Food and Drug Administration or World Health Organization.

    "Proof of vaccination" means proof that an individual:
    a.  Has been fully vaccinated;
    b.  Has received a single dose vaccine, or the second dose of a two-dose vaccine, even if two weeks have not passed since they received the dose; or
    c.  Has received the first dose of a two-dose vaccine, in which case they must additionally provide proof that they have received the second dose of that vaccine within 45 days after receipt of the first dose.

    "Staff of contractors of DOE or the City" means a full or part-time employee, intern or volunteer of a contractor of DOE or another City agency who works in-person in a DOE school

setting, a DOE building, or a charter school, and includes individuals working as independent contractors.

"Visitor" means an individual, not otherwise covered by Paragraph 1 of this Order, who will be present in a DOE school building, except that "visitor" does not include:

    a. Students attending school or school-related activities in a DOE school setting;

    b. Parents or guardians of students who are conducting student registration or for other purposes identified by DOE as essential to student education and unable to be completed remotely;

    c. Individuals entering a DOE school building for the limited purpose to deliver or pick up items;

    d. Individuals present in a DOE school building to make repairs at times when students are not present in the building;

    e. Individuals responding to an emergency, including police, fire, emergency medical services personnel, and others who need to enter the building to respond to or pick up a student experiencing an emergency;

    f. Individuals entering for the purpose of COVID-19 vaccination;

    g. Individuals who are not eligible to receive a COVID-19 vaccine because of their age; or

    h. Individuals entering for the purposes of voting or, pursuant to law, assisting or accompanying a voter or observing the election.

"Works in-person" means an individual spends any portion of their work time physically present in a DOE school setting, DOE building, or charter school setting. It does not include individuals who enter such locations for the limited purpose to deliver or pick up items unless the individual is otherwise subject to this Order. It also does not include individuals present such locations to make repairs at times when students are not present in the building unless the individual is otherwise subject to this Order.

6. Nothing in this Order shall be construed to prohibit any reasonable accommodations otherwise required by law.

7. This Order shall be effective immediately and remain in effect until rescinded, subject to the authority of the Board of Health to continue, rescind, alter or modify this Order pursuant to Section 3.01(d) of the Health Code.

Dated: September 15, 2021

                                      Dave A. Chokshi, M.D., MSc
                                      Commissioner



**The University of the State of New York**
The State Education Department
**Teacher Tenure Hearing Unit**
89 Washington Ave., Room 987 EBA
Albany, New York 12234

Ph: (518) 473-2829
Fax: (518) 402-5940

(09/21)

# Rights of Tenured Employees
*(This document only applies to cases where charges were filed on or after July 1, 2015.)*

This document, while not intended to be exhaustive, describes certain rights of tenured employees in Education Law §3020-a and §3020-b* proceedings. The information contained in this document should not act as a substitute for the applicable statutes or regulations. Individuals are advised to consult with an attorney as significant adverse consequences may result from these proceedings.

> ### Special Notice to Tenured Employees of the
> ### New York City Department of Education
>
> *Many of the provisions in Education Law §3020-a and/or §3020-b, including those described in this document, have been substantially modified by the collective bargaining agreement and subsequent amendments and/or revisions between the United Federation of Teachers ("UFT") and the New York City Department of Education ("NYCDOE"). Education Law §3020(3) permits the NYCDOE to modify the provisions of Education Law §3020-a through the collective bargaining process. If you are a tenured employee of the NYCDOE, you are advised to review your collective bargaining agreement and any amendments and/or revisions thereto to determine whether your rights may deviate from the provisions described below. If you have any questions, you should consult with the UFT and/ or an attorney.*

Tenured individuals cannot be disciplined or removed from employment except for "just cause" pursuant to Education Law §3020. The procedures for such discipline or removal are set forth in Education Law §3020-a, Education Law §3020-b, and the Commissioner's Regulations 8 NYCRR Ch. II, Sub. C, Part 82-3.

## Charges

1. The employing board of education ("board") must determine, by a majority vote, that probable cause exists to bring a disciplinary proceeding against the tenured employee ("employee").
2. If the board finds probable cause, the tenured employee must be provided with a written statement specifying: a.) the charges in detail; b.) the maximum penalty the board will seek if the employee is found guilty of the charges or that will be imposed if the employee does not request a hearing; and c.) a copy of this form outlining the employee's rights. The charges must be sent by certified or registered mail, return receipt requested or by personal delivery.
3. Charges cannot be brought more than three years after the alleged incompetency or misconduct, except when the charge is of misconduct constituting a crime when committed.

## Suspension Pending Hearing

The employee may be suspended pending a hearing on the charges and the final determination thereof. An employee may be suspended without pay if: a.) the employee has pleaded guilty to or has been convicted of certain felony drug crimes or a felony crime involving the physical abuse of a minor or student; or b.) the employee is charged with misconduct constituting physical or sexual abuse of a student. Employees suspended without pay due to charges constituting physical or sexual abuse of a student, are entitled to an expedited probable cause hearing.

## Termination Without Hearing

The employee shall be terminated without a hearing upon conviction of a sex offense as defined by Education Law §305(7-a)(b)(2). Employees acting as school administrators or supervisors shall be terminated without a hearing upon conviction of defrauding the government as defined by Education Law §305(7-b)(b)(2).

## Hearing Request/Failure to Request

1. Within 10 days of receiving charges, the employee must provide a written request to the clerk or the secretary of the employing board if the employee desires a hearing on the charges.
2. In the written request for hearing, the employee should indicate the name and contact information for the attorney who will represent the employee, if any. Such attorney shall be authorized to receive all correspondence related to the proceeding on the employee's behalf.

3. If the employee does not request a hearing within 10 days of receipt of the charges, the employee shall be deemed to have waived the right to a hearing if there is an unexcused failure to request a hearing.

4. If the employee waives his right to a hearing, the board shall proceed, within fifteen days, by a majority vote to determine the case and fix the penalty, if any, to be imposed.

## Hearing Officer Selection Process

1. Within 3 business days of receipt of the written hearing request, the clerk or secretary of the board shall notify the commissioner of the need for a hearing.

2. Upon receipt of such notification, the commissioner shall request that the American Arbitration Association provide a list of names of individuals to potentially serve as hearing officers along with relevant biographical information concerning the individual. The commissioner shall forthwith send such list to both parties.

3. For charges brought pursuant to §3020-a, the employee and the board must notify the commissioner of their agreed upon hearing officer selection within 15 days of receiving the list of potential hearing officers. If the parties fail to agree or fail to notify the commissioner of their selection within 15 days, the commissioner shall appoint a hearing officer from the list.

4. For charges brought pursuant to §3020-b, where an employee has received two consecutive ineffective ratings, the employee and the board must notify the commissioner of their agreed upon hearing officer selection within 7 days of receiving the list of potential hearing officers. If the parties fail to agree or fail to notify the commissioner of their selection within 7 days, the commissioner shall appoint a hearing officer from the list.

5. For charges brought pursuant to §3020-b, where an employee has received three consecutive ineffective ratings, the commissioner shall appoint a hearing officer from the list.

## Pre-Hearing Conference

1. The pre-hearing conference shall be private.

2. The hearing officer shall hold a pre-hearing conference within 10-15 days of receipt of notice from the commissioner confirming his or her acceptance to serve in such position, in the case of a standard or expedited §3020-a hearing.

3. For expedited §3020-b hearings where the employee has received 2 consecutive ineffective APPR ratings, the hearing officer shall hold a pre-hearing conference within 7 days of receiving notice confirming the hearing officer's agreement to serve.

4. For expedited §3020-b hearings where the employee has received 3 consecutive ineffective APPR ratings, the hearing officer shall hold a pre-hearing conference within 5 days of receiving notice confirming the hearing officer's agreement to serve.

5. At the pre-hearing conference, the hearing officer has the power to: a.) issue subpoenas; b.) hear and decide motions and applications made by either party; c.) set a schedule for full and fair disclosure of witnesses and evidence for both parties; and d.) set the time and place for hearings to ensure that the hearing is conducted within the statutory timelines.

6. Generally, pre-hearing motions must be made on written notice to the hearing officer and adverse party at least 5 days before the pre-hearing conference. Any pre-hearing motions not made as provided for herein shall be deemed waived. However, for expedited hearings, written notice to the adverse party shall be made no later than 2 days before the pre-hearing conference.

## General Hearing Procedures

1. The hearing will be conducted by a single hearing officer.

2. The employee shall have a reasonable opportunity to defend his or herself, including making any additional motions and applications and an opportunity to testify on his or her own behalf, however, the employee shall not be required to testify.

3. Each party has the right to be represented by counsel, and may subpoena and cross-examine witnesses. All testimony shall be under oath.

4. An accurate record of the hearing shall be kept at the expense of the commissioner. Upon request, the employee is entitled to a copy of the record without charge.

5. If the hearing officer needs to be replaced and the parties fail to notify the commissioner of their mutually agreed upon replacement within 2 business days, the commissioner shall select the replacement.

6. At the conclusion of the testimony, the hearing officer may allow the parties to submit memoranda of law; however, such submission may not delay the date that the hearing officer is required to render a decision.

7. In general, hearings must be completed within 60 days of the pre-hearing conference. Please see below for the time periods applicable to particular expedited hearings.

8. In general, all evidence must be submitted within 125 days of the filing of charges and no additional evidence shall be accepted after such time, absent extraordinary circumstances beyond control of the parties.

### Expedited Hearing Based on Revocation of Certification

1. If the charges are based upon revocation of the employee's certification, an expedited hearing must be held.

2. The hearing shall commence within 7 days of the pre-hearing conference and is limited to one day. The hearing may not be adjourned except upon request of a party and only for good cause as determined by the hearing officer.

### Expedited Hearing Based on Charges Constituting Physical or Sexual Abuse of Student

1. If the charges are based upon allegations of physical or sexual abuse of a student, an expedited hearing must be held.

2. The hearing shall commence within seven days after the pre-hearing conference and shall be completed within sixty days after the pre-hearing conference. Adjournments may not be granted that would extend the hearing beyond 60 days, except where the hearing officer determines that the delay is both substantially beyond control of the requesting party and an injustice would result if the adjournment were not granted.

### Expedited Hearing Based on Two Consecutive Ineffective APPR Ratings

1. The Board may bring charges alleging incompetence based upon two consecutive ineffective APPR ratings, in which case an expedited hearing must be held, but the board is not required to bring charges.

2. The hearing must begin within 7 days of the pre-hearing conference and be completed within 90 days following the date that the employee requested the hearing. Adjournments may not be granted that would extend the hearing beyond 90 days, except where the hearing officer determines that the delay is both substantially beyond control of the requesting party and an injustice would result if the adjournment were not granted.

3. The charges must allege that the board has developed and substantially implemented a teacher or principal improvement plan for the employee following the first evaluation in which the employee was rated ineffective and the immediately preceding evaluation if the employee was rated developing.

### Expedited Hearing Based on Three Consecutive Ineffective APPR Ratings

1. The Board shall bring charges alleging incompetence where any teacher or principal receives three consecutive ineffective APPR ratings, in which case an expedited hearing must be held.

2. The hearing must commence within 5 days of the pre-hearing conference and be completed within 30 days following the date that the employee requested the hearing. Adjournments may not be granted that would extend the hearing beyond 30 days, except where the hearing officer determines that the delay is both substantially beyond control of the requesting party and an injustice would result if the adjournment were not granted.

### Decision

1. With the exception of expedited hearings, the hearing officer shall render a written decision within 30 days of the last hearing date.

2. For expedited hearings, the hearing officer shall render a written decision within 10 days of the last hearing date.

3. The commissioner must immediately forward copies of the decision to the parties.

4. The hearing officer shall render a written decision that includes findings of fact and conclusions, based upon the findings of fact, as to each charge and shall state the penalty, or other action, if any, against the employee on each charge.

## Rights of Tenured Employees *(cont.)*

5. In those cases where a penalty is imposed, such penalty may be a written reprimand, a fine, a suspension for a fixed time without pay, or dismissal.

6. In determining penalty, the hearing officer shall give serious consideration to the penalty recommended by the board, and if the hearing officer imposes a different penalty, then the hearing officer must indicate the reasons for the alternate penalty based upon the record.

7. Within 15 days of the receipt of the hearing officer's decision, the board shall implement the decision. If the employee is acquitted of the charges, he or she must be restored to his or her position with full pay for any period of suspension without pay and the charges expunged from the employment record.

8. The hearing officer shall indicate in the decision whether any of the charges brought by the board were frivolous as defined by the Civil Practice Law and Rules §8303-a. If the hearing officer finds that all of the charges were frivolous, the hearing officer shall order the board to reimburse both the employee and the department reasonable costs that were incurred. If the hearing officer finds that some, but not all of the charges were frivolous, the hearing officer shall order the board to reimburse a portion of the reasonable costs incurred to the department and the employee.

### Appeal

1. Not later than 10 days after receipt of the hearing officer's decision, either the employee or the board may make an application to the New York State Supreme Court to vacate or modify the hearing officer's decision pursuant to Civil Practice Law and Rules §7511.

2. The filing of the pendency of an appeal shall not delay the implementation of the hearing officer's decision.

### Restoration of Rights

If an employee who was convicted of a felony crime as specified in Education Law §3020-a(2)(b) has his or her conviction reversed, the employee, upon application, shall be entitled to have his or her pay and other emoluments restored, for the period of time extending from the date of suspension to the date of the decision.

\*Pursuant to §§ 30-2.14 and 30-3.17 of the Rules of the Board of Regents, educators whose Annual Professional Performance Reviews (APPRs) include results from the State's growth model (i.e., teachers of grades 4-8 ELA and Mathematics; principals of buildings including those grade levels; and principals of buildings including all of grades 9-12) or any other measures based on the grades 3-8 ELA and Mathematics State assessments will receive both an "original" evaluation and a "transition" evaluation. This process will continue through the 2018-19 school year, during the time that the State transitions to new ELA and Mathematics learning standards and assessments and during that time the State will explore potential revisions to the evaluation framework. The "original" evaluation will include the results of the State's growth model and any other measures based on the grades 3-8 ELA and Mathematics State assessments. This evaluation is provided for advisory purposes only and cannot be used for employment related decisions. Affected educators will also receive a "transition" evaluation that excludes the above referenced measures. During the transition period, only this transition score and rating will be used for purposes of employment decisions, including tenure determinations and for purposes of proceedings under Education Law §§3020-a and 3020-b.