*** Filed ***
05:08 PM, 23 Oct, 2025
U.S.D.C., Eastern District of New York

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
_____x

**JEAN JEAN, and KATHLEEN COMACK**

       Plaintiffs   DOCKET NO. 24-cv -02264-LDH-CHK

  -against-        **RESPONSE TO ORDER**
               **TO SHOW CAUSE**

**THE DEPARTMENT OF EDUCATION OF**
**THE CITY OF NEW YORK,**

       Defendant
_____x

PLAINTIFFs Jean Jean and Kathleen Comack ("Plaintiffs") proceeding Pro Se, submit here their

Response to the Judge's Order to Show Cause, with their Declaration pursuant to 28 U.S.C.

§1746 and allege upon knowledge as to their own facts and upon information and belief as to all

other matters:

## PRELIMINARY STATEMENT

1. On March 28, 2025, PLAINTIFFS PRO SE Jean Jean and Kathleen Comack

   ("Plaintiffs") filed this action seeking injunctive relief, monetary relief, including past

   and on- going economic loss, compensatory and equitable damages for the retaliation,

   discrimination and hostile work environment imposed on them solely due to their

   requesting accommodations for their religious beliefs and medical conditions which

   prohibited them from getting the COVID vaccine. Both were stellar teachers for more

   than 20 years, and they both had tenure. Defendant refused to recognize Plaintiffs'

   protected religious beliefs and medical issues and punished Plaintiffs for

1

"misconduct/insubordination" by remaining unvaccinated. At all times, Defendant acted under color of law.

2. Plaintiffs were removed from their salaries, threatened with immediate termination, harassed and subjected to a hostile atmosphere in their workplaces, placed into the "Problem Code" database, and forced to resign without any hearing after they could not withstand the retaliation and harassment from co-workers and others.

3. Neither Jean nor Comack received any accommodation from Defendant and neither were given a §3020-a due process arbitration to on the validity and/or details of their appeals for religious accommodation (Jean) or medical accommodation (Comack).

4. Defendant is liable for the Section 1983 and ADA/504 Rehabilitation Act because the facts below, and the evidence as described in the accompanying Declaration, show that these all stem from a municipal policy, custom and practice in place since 2002.US Supreme Court Justice Brennan, held that: local government units were "persons" for purposes of § 1983, the Civil Rights Act of 1871; local governments could not be held liable under a theory of respondeat superior but rather could be held liable only when the constitutional deprivation arises from a governmental custom; local government officials sued in their official capacity are "persons" under § 1983 in those cases in which local government is suable in its own name, and the deprivation complained of in the instant case arose out of official policy." See Monell v N.Y. C. Dept. of Soc. Serv., 436 U.S. 658 (1974). Additionally, "[l]ocal governments may be sued for constitutional deprivations visited pursuant to governmental custom even though such a custom has not received formal approval through the body's official decision-making channels." 42 U.S.C.A. § 1983. (Wright v The City of New York et al., 23-cv-03149-KPF). Here, Plaintiffs state a

claim of retaliation against them for applying for accommodations, and requesting a hearing.Education Law 3020-a is NY State public policy, and protected by the 14th Amendment **EXHIBIT 1**

5.  The elements of a retaliation claim under either Section 504 or the ADA are "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." Id. (citing Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 148 (2d Cir. 2002) (citations omitted); Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir. 2012), Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 234 (2d Cir. 2000); Sands v. Runyon, 28 F.3d 1323, 1331 (2d Cir. 1994)).

6.  As Plaintiffs experienced continuous retaliation, under the continuing violation doctrine, "if a plaintiff has experienced a continuous practice and policy of discrimination, the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001) (internal citations omitted). "To bring a claim within the continuing violation exception, a plaintiff must at the very least allege that one act of discrimination in furtherance of the ongoing policy occurred within the limitations period." Patterson v. County of Oneida, 375 F.3d 206, 220 (2d Cir. 2004). The U.S. Supreme Court held in Nat'l R.R. Passenger Corp. v. Morgan, that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." 536 U.S. 101, 113, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). See Doe v. Anonymous Inc., 2019 U.S. Dist. LEXIS 107886, 2019 WL 2616904. In this case,

Plaintiffs pled at least one act of retaliatory discrimination – the Problem Code and deprivation of a 3020-a hearing - they experienced during their employment which was in furtherance of Defendants' ongoing retaliatory weaponization and criminalization of employment practices.

7. Plaintiffs completed all the necessary actions and appeals available to them, including filing an appeal of the denials of their requests and appeals for religious exemption and medical accommodation. However, the Defendant never gave any meaningful reason for the denials.Defendant never complied with any Department of Health ruling that allowed accommodations. The Defendant opposed almost all of the so-called "excuses" for not getting vaccinated , except for a few hundred educators who got approved for exemptions, but no one knows how or why. Plaintiffs here were not in that approved group. The COVID mandate as applied to Plaintiffs was arbitrary, not generally applicable, and certainly not neutral.

8. Both Plaintiffs filed Notices of Claim which have not been resolved by Defendant.

9. Defendant secretly charged Plaintiffs with misconduct/insubordination by placing their fingerprints into the "Problem Code" database without their knowledge or consent, and never gave them a hearing where they could clarify and particularize their reasons for not getting the COVID vaccination.Defendant did not have any justification for removing every unvaccinated educator from their salary, and certainly did not want to sit in a hearing and have to answer questions about why some was granted an accommodation and another person was not. The Defendant never had any policy that they could explain. Also, the COVID Vaccine Mandate never changed any employee union contract, but Defendant maintained that the terms of employment were changed. This is false. See

**The New York City Department of Education, UFT, Problem Code, and Perpetual Fog Machine Continue To Prevent Unvaxxed Employees From Working**
https://advocatz.com/2023/02/12/the-new-york-city-department-of-education-problem-code-continues-to-prevent-unvaxxed-employees-from-working/

10. Plaintiffs' Complaint has successfully pled retaliation pursuant to Section 1983 deprivation of Constitutional rights and, in Comack's case, pursuant to the ADA/504 Retaliation Act, due to their requests for accommodations for exemptions from getting the COVID vaccine. But for their accommodation appeals, they would still be employed in their prior positions.

11. In this Response to the Judge's Order to Show Cause we argue below that  our retaliation claims should not be dismissed for failure to state a claim

**Elements of a Section 1983 Claim For Deprivation of Rights**

12. A Section 1983 is described as:

"42 U.S.C. § 1983 is a federal law that allows individuals to sue state and local government officials who violate their civil rights under the Constitution or other federal laws. It is a civil remedy for deprivation of rights, meaning it provides a way to seek damages or other relief when rights are violated, rather than being the source of those rights itself. Common claims under this statute include violations of free speech, due process, equal protection, and freedom from unreasonable searches and seizures, often involving issues like police misconduct or prison conditions."

13. Section 1983 creates a cause of action, allowing individuals to file lawsuits in federal court against state and local officials acting "under color of state law". The law does not create new rights but provides a way to enforce those already established by the Constitution and federal statutes.

14. "Under color of State Law": The defendant must be acting with the authority of the state or local government. This can include government employees and sometimes private actors carrying out a public function.

15. Often referred to simply as Section 1983, 42 U.S.C. § 1983 allows a person to sue state and local government officials who have violated their civil rights. To summarize, any person is liable when they act under the <u>color of law</u> in such a way that it deprives a U.S. citizen — or a person within the United States jurisdiction — of the rights, privileges, or immunities guaranteed to them by the Constitution or by federal or state law. The U.S. Supreme Court has interpreted Section 1983 to mean that a plaintiff must prove two elements to prevail on their claim: (1) The defendant acted under the color of state law; (2) The act(s) (or failure to act) of the defendant deprived the plaintiff of their particular rights under either the laws of the United States or the U.S. Constitution.

## STANDARD OF REVIEW:FED.R.CIV.P.12(B)(6)

16. In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the Plaintiff. See, e.g., Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt., 843 F.3d 561, 566 (2d Cir. 2016); Walker v. Schult, 717 F.3d 119, 124 (2d Cir. 2013); Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006);Bold Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995); Reed v. Garden City Union Free Sch. Dist., 987 F. Supp. 2d 260, 263 (E.D.N.Y. 2013). Under the Twombly standard, the Court may only dismiss a complaint if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The Second Circuit has expounded that, after Twombly, the Court's inquiry under Rule 12(b)(6) is guided by two principles:

First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss and [d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.
Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)).

A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to survive a motion to dismiss. FED.R.CIV.P. 8(a)(2). Under Rule 8, a complaint is not required to allege "detailed factual allegations." Kendall v. Caliber Home 5 Loans, Inc., 198 F. Supp. 3d 168, 170 (E.D.N.Y. 2016) (quoting Twombly, 550 U.S. at 555). "In ruling on a motion pursuant to FED.R.CIV.P. 12(b)(6), the duty of a court 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'"DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 113 (2d Cir. 2010) (quoting Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998)). The Court "[is] not bound to accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555.


### THE DEFENDANTS' INTENTIONALLY DENIED PLAINTIFFS' PROCEDURAL CONSTITUTIONAL DUE PROCESS UNDER THE 14TH AMENDMENT IN RETALIATION FOR PLAINTIFFS' REFUSING COVID VACCINATION

*Tenure remains public policy and a Constitutional and property right in New York State and NYC.*

17. Both Plaintiffs exhausted their administrative remedies that were available to them, although they were hampered by the narrow timelines, cut-off time of submissions, secrecy and false claims made by the Defendants.

18. Tenured employees of the NYC Department of Education have Constitutional property and Liberty rights to their jobs since 19 Cleveland v Loudermill (470 US 532 (1985)) was a landmark 1985 U.S. Supreme Court case that established that public employees with a property interest in their jobs are entitled to a "pre-termination" hearing, which requires notice of the charges and an opportunity to respond. The Court held that this minimal hearing, coupled with subsequent post-termination procedures, satisfies the due process requirements of the Fourteenth Amendment. This ruling prevents public employees from being fired summarily without a chance to defend themselves, even if the hearing is not a full-blown trial. Plaintiffs accommodation requests should have been given strict scrutiny, and they should not have been punished by Defendants placing a "Problem Code" on their fingerprints marking them as guilty of misconduct for requesting these accommodations.

19. Plaintiffs here were never given *any* hearing, and not a §3020-a as required by Ed. Law §3020-a. These 3020-a proceedings are public policy in New York State and have given protected status to New York City Teachers since 1897. The law has been revised since then, but never replaced or removed from the very important place it has in discipline for tenured educators. Recent published transcripts of Eric Eichenholtz, members of the Citywide Panel and Katherine Rodi have shown that the Defendants have been defending their terminations and lack of accommodations given to Plaintiffs here and in multiple cases involving public employees, based upon claims made from whole cloth. See

**The Citywide Panel and the Final Judgment in Kane-Keil-New Yorkers For Religious Liberty**
https://advocatz.com/2025/01/25/new-york-state-court-of-appeals-issues-an-amended-judgment-in-new-yorkers-for-religious-liberty-et-al-v/

and,

**The City of New York and the NYC Department of Education Never Intended on Honoring Requests For Religious Exemptions From Getting the COVID Vaccine By Municipal Workers**

https://advocatz.com/2025/05/28/the-city-of-new-york-and-the-nyc-department-of-education-never-intended-on-honoring-requests-for-religious-exemptions-from-getting-the-covid-vaccine-by-municipal-workers/

20. In this post is the testimony by Defendant Rodi, Director of Employee Relations and the

Office of Personnel Investigations ("Problem Code"), and also head of the 'General

Committee' who denied all applications for accommodations, She is key to the retaliation

against Plaintiffs described here:

"With further questioning, Rodi explains that the general committee members were under pressure to reopen in-person schooling and couldn't do so without replacing at least some of the DOE employees who were barred from entering school buildings. Rodi describes the flood of requests for accommodations the DOE received during the fall of 2021:

*We received it from teachers, from custodians, from school food workers, from principals, from assistant principals, from, you know, name the person, name the job. And the fact is that we needed to run a school system . . .*

She describes denying accommodation requests in order to "resign" employees so that they could be replaced:

*[T]he only option was [sic] had was to resign them from the system without any bias so that we could hire other teachers. Because, again, we had a school to run.*

Later [Attorney Austin] Graff questions Rodi about the details of what happened to each individual's request for an accommodation:

*Q. Okay. So when you received an application for religious exemption, what did you review to make a determination whether to grant or deny?*
*A. We made sure that the person had appropriately applied in the right area. A number of people would check religious exemption, but they were really looking for a medical exemption.*
*We also made sure that they actually submitted something with their application, because some people included blank sheets of paper. And, then, if it was a medical—if it was in the wrong place, we—we immediately advised them so that they could reapply or reapply in the right place. If it was a blank piece of paper, we immediately advised them so that they could submit appropriate documentation.*
*And then, other than that, we then—we reviewed to make sure they had submitted something to support, you know, that it was religious in nature. We didn't judge what it*

*was. And even if it was just a piece of paper that they wrote out. And then we denied their request.*

See Rodi problem code testimony

21. According to this description, the "individual review" the applicants received was simply a check to make sure they hadn't mistakenly submitted a blank piece of paper or a medical accommodation request.

22. These actions by Defendants are deliberate, misleading and made in bad faith. No hearing was ever held where Plaintiffs could be heard on their reasons for not getting vaccinated against COVID. They both have been denied their procedural and substantive due process, and retaliated against.

***The COVID Vaccine Mandate as Applied to Plaintiffs and Public School Personnel was  Retaliation and Punishment For Requesting an Exemption/Accommodation Rather than Get Vaccinated***

23. Placing a Problem Code on an employee's personnel file constitutes discipline, and EDL §3020 and §3020-a is triggered, with all Constitutional protections and procedures allowable under the 14th Amendment.

24. In Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006) the U.S. Supreme Court ruled that Ms. White's suspension for 37 days from her job operating a forklift was retaliatory discrimination and a jury awarded her compensatory damages.

*"The anti-discrimination provision seeks a workplace where individuals are not discriminated against because of their status, while the anti-retaliation provision seeks to prevent an employer from interfering with an employee's efforts to secure or advance enforcement of the Act's basic guarantees. To secure the first objective, Congress needed only to prohibit employment-related discrimination. But this would not achieve the second objective because it would not deter the many forms that effective retaliation can*

*take, therefore failing to fully achieve the anti-retaliation provision's purpose of "[m]aintaining unfettered access to statutory remedial mechanisms," Robinson* v. *Shell Oil Co.,* <u>519 U. S. 337</u>, 346."

25. Thus… the anti-retaliation provision is not limited to actions affecting employment terms and conditions. In **Perry v Sindermann** (408 U.S. 593 (1972)) the U.S. Supreme Court decided that Sindermann had alleged enough facts to show that he was entitled to some kind of process and that the lack of a contractual or tenure right taken alone did not defeat his claim that the nonrenewal of his contract violated the First and Fourteenth Amendments. While Sindermann did not have tenure *per se*, his length of service at his last institution (more than the four years mentioned as the probationary period for a full-time instructor in the "Policy Paper 1" guidelines), he had asserted that he had *de facto* tenure, giving him a property interest in his job such that it fell under the 14th Amendment protection. The court ruled that "the respondent must be given an opportunity to prove the legitimacy of his claim of such entitlement in light of the policies and practices of the institution. Proof of such a property interest would not, of course, entitle him to reinstatement. But such proof would obligate college officials to grant a hearing at his request, where he could be informed of the grounds for his non-retention and challenge their sufficiency."

26. Here, both Plaintiffs are tenured employees with property and liberty rights to their employment in the NYC DOE. Both, when charged with misconduct and a problem code was placed on their personnel records and then they were terminated, were unlawfully separated from their jobs without a hearing in violation of the 1st, 5th, and 14th Amendments and Education Law §3020.

27. LWOP, or "leave without pay" forcing all unvaccinated employees of the NYC DOE off salary in October 2021 was made up by Arbitrator Martin Scheinman and applied to Plaintiffs without any law, statute, memorandum or other contractual clause to validate it. LWOP left permanent harm on Plaintiffs in that their salaries and pension steps were permanently denied to them unfairly and without Just or Probable cause. Neither Plaintiff waived their rights to these benefits of their tenured status. The DOE should never have proceeded with termination, as they could not proceed due to the un-waived procedural defect cited here (see, Hackett v. Milbank, Tweed, Hadley & McCloy, 86 N.Y.2d 146,154-55, 630 N.Y.S.2d 274,654 N.E.2d 95 [1995]). Fraudulent concealment of a secret waiver of the rights of tenured employees to the tenure law Education Law 3020-a(2)(a) and Constitutional rights of property and liberty by the NYC Department of Education cannot be sanctioned. The same can be said about the Problem Code.

28. The fact that any NYC DOE employee who did not hand in a vaccination card on October 4, 2021 was placed immediately on a problem code triggered §3020-a disciplinary procedures. Problem Code Documents, and in particular the email from DOE employee Eric Amato attached to the Declaration of Betsy Combier.. This shocking information criminalized the unvaccinated public employees working for the NYC DOE, who suddenly, secretly and permanently became prohibited from working in their jobs and chosen careers. Plaintiffs did not know anything about the Problem Code flag until it was revealed to them in February 2023, and their search for jobs and always not getting hired suddenly made sense. This Code is visible publicly since 2022.

29. In 2012 the UFT filed a PERB complaint against the NYC DOE on the issue of the secrecy of this Code. As part of that litigation, Katherine Rodi was deposed on November

3, 2015. Ms. Rodi described the procedure of placing an employee on the Code/flag due to misconduct. She testified that the information from the investigators was used to designate an employee as guilty of some heinous act, and therefore a Principal would not hire this applicant. She added that "No Respondent will ever see their flag". Defendants never gave any DOE employee information about, or notice of, a problem code on their personnel file.. The Decision of PERB case U-32479 (June 2022) was an Order that the DOE work with the UFT to reveal problem codes on personnel files of UFT members who can see what documents are accusing them of misconduct, and, if these documents are false, promptly remove them from the file. The Defendants have never complied.

30. The DOE thwarts anyone from seeing their Problem Code, because they do not want to give any reasons for placing it on a person's personnel file. There usually are none. In the case of Philomena Brennan, who filed an Article 78 to remove the problem code from her file, Supreme Court Judge Alice Schlesinger ordered the DOE to submit to the Court their procedures for removal of the Code. The DOE settled the case, and took Ms. Brennan immediately off the Code – all to keep the procedures secret. See Brennan v NYC Dep't of Education, Index No. 112977/2009,

31. Before Loudermill, New York State Education Law §3020-a gave tenured public education employees protected job status and Constitutional rights to their employment since tenure rights were established for NYC teachers in 1897. The process involves a formal hearing before an arbitrator or panel where the tenured educator can present evidence, call witnesses, and challenge the school district's case. The district must have "just cause," and if the teacher is found guilty, a penalty ranging from a reprimand to termination can be imposed. The goal is to protect a teacher from being removed,

suspended without pay, or terminated, without Just Cause or probable cause. Tenure remains public policy and a Constitutional and property right in New York State and NYC, and is also a human right not only in state Law, but also in employment contracts statewide. Plaintiffs were never given a hearing on their requests for accommodation. See the case of Kambouris v NYC Dep't of Education, Index No. 518863; Abramovich v. Board of Ed. of Central School Dist. No.1 of Town of Brookhaven and Smithtown  62 A.D.2d 252 [2d Dept. 1978] (holding that the public policy expressed in the tenure statutes is designed to protect individual teachers, as public servants, from being dismissed without a hearing once their competency has been demonstrated); McElroy v. Board of Educ. of Bellmore-Merrick Cent. High School Dist,  5 Misc.3d 321 [Sup Ct. Nassau County, 2004] (acknowledging purpose of statute is to protect tenured teachers from arbitrary discipline); Cardinale v NYC Department of Education, Index No. 85165/2017.

32. In order for a tenured educator to be taken off of his/her salary, there must be a probable cause hearing where the NYC DOE has the burden of proof. EDL §3020-a "provides the exclusive method of disciplining a tenured teacher in New York State.  Tebordo v. Cold Spring Harbor Cent. School Dist., 126 A.D.2d 542, [2d Dept. 1987]. DOE's attempt to characterize its accusations against Plaintiffs here as anything other than misconduct or wrongdoing flies in the face of the facts. And even then, its claim cannot be sustained as a matter of law see Mannix v Bd. of Ed. of City of New York, 21 NY2d 455 [1968] (holding that the employing board improperly terminated tenured teacher accused of not fulfilling a condition of employment by not providing the teacher with due process under EDL §3020-a );  Matter of Glass v. Board of Education, 21 A.D.2d 891 [1964] (finding

tenured teacher entitled to EDL §3020-a hearing where board claimed teacher failed to meet a condition of employment); Lynch v Nyquist, 41 AD2d 363, 365 [3d Dept. 1973] (stating that certification requirements cannot be used as means to erode the protection afforded to tenured teachers and that the regardless of the strength of the board's proof that the teacher was not actually certified it had to proceed pursuant to EDL §3020-a).  A tenured teacher cannot be suspended without pay unless he or she has ***been convicted***  of specified crimes. EDL §3020-a[2][a][b](emphasis added). It follows by analogy, that Plaintiffs cannot be reassigned, taken off salary, or terminated based on speculation and mystery investigations The deprivation of constitutional rights is per se irreparable harm see Ferreyra v. Decker, 456 F.Supp, 549 [S.D.N.Y. 2020], Mitchell v. Cuomo, 748 F.2d 804, 806 [2d Cir. 1984]. The tenure statutes reflect the intent and purpose of the Legislature to protect educators who have successfully completed a probationary period from being disciplined summarily without the safeguards of Education Law § 3020-a. Holt v. Board of Educ. of Webutuck Cent. School Dist., 52 N.Y.2d 625 (1981)

33. Defendant has not submitted any proof of their specious, deceptive and false claims that Plaintiffs did not establish a prima facie case of religious and medical retaliatory discrimination. Defendant's statement that Plaintiffs suffered an adverse employment action for "failing to comply with the conflicting employment requirement" is also false. The conflict, if any, was with the unlawful due process designed by the Defendant out of thin air. There was no employment requirement to get vaccinated with the COVID vaccine or be fired. Defendant made that up, and then used it as their standard to dismiss Plaintiffs' case. In this Court, the failure to accommodate has been and continues to be a winning claim. See  Hill v The Department of Education 24-cv-3506-RPK-LB; Mumin v

The City of New York et al., 23-cv-03932 (JLR) S.D.N.Y.; Hernandez v. The Richmond County District Attorney, et al., 24-CV-05790 (BMC); Masciarelli v New York City Department of Education, just to state a few out of many. In Di Capua v City of New York (Richmond County Supreme Court, Index No. 85035/2023), 10 employees of the NYC DOE won their religious exemption/accommodations, jobs, and backpay. Jennifer LaBarbera also won her job, backpay and religious accommodation/exemption despite her signing a waiver promising she would not challenge her resignation. Index No. 85001/2023.

***The Defendants set up defenseless timelines for submitting accommodation requests***

34. Defendants set up the timelines for medical and religious accommodation requests and Appeals in such a way as to deny almost anyone who submitted a request. This is retaliation, for submitting their religious and medical accommodation requests. Applicants for a medical or religious accommodation found themselves blocked by Defendants from applying, due to limited timelines of one day, or a holiday or the Sabbath, if an employee was Jewish.. Defendants' actions were deliberate, to punish all public workers who would not obey the lies and false policies concerning the COVID Vaccine. The numbers given by the Defendants change from day to day, but there were about 168-176 employees of the NYC DOE who received exemptions and kept working in a reassigned place or "rubber room" for the duration of the CVM (made voluntary by Mayor Adams in February, 2023). Hundreds of people got these exemptions based on unknown criteria.  City Law Department Attorney Sarah Paulson, Kane v. De Blasio, 19 F.4th 152, 168–69 (2d Cir. 2021),.

35. How and why some people and not others were chosen, including Plaintiffs, are mysteries yet to be unraveled. See Amended Complaint, pp. 7-11. RF won his religious exemption and was appointed Director/administrator of the reassignment building, St.Brigids, for 90 DOE employees who received their religious or medical exemptions. Daniel Mickelson was another teacher who was at St. Brigids, and they both discussed their "rubber room" in the media. See RF's Religious Exemption appeal Yet Plaintiffs received no such protection. This is clearly systemic retaliation.

36. After the mandate was repealed in February 2023, Defendants continued to refuse to reinstate the fired employees, who now had "problem codes" on their DOE file (typically reserved for serious misconduct like child abuse). All employees with problem codes are blocked from getting jobs within the NYC DOE – and its' vendors – as well as unemployment benefits by falsely claiming they committed "misconduct" for adhering to their religious beliefs. Thus, Plaintiffs' harm is continuing today, and their claims are not time barred. This is a continuing wrong.

37. Almost as if he was unconscious about the harm done by the CV,NYC Mayor Eric Adams issued a countless stream of Executive Orders to please his friends and allies – and school bus drivers -, while furthering the gap between his people and municipal workers. See EXECUTIVE Order EO 62, which lifted New York City's COVID-19 vaccine mandate for professional athletes and performers, addressing the competitive disadvantage they faced compared to visiting teams. This order also allowed fast-food employers to have "just cause" to terminate an employee who failed to provide proof of vaccination, an action seen as a step to support the city's economic recovery and businesses permitted Broadway Stars, election workers, NYC school bus drivers and

baseball players, unilateral exemptions. Defendants denied 100% of religious accommodation applications, including Plaintiffs', via auto-generated emails. Defendant Katherine Rodi denied every request without any review. (See pp. 8-9)

38. In sum, both Plaintiffs exhausted their administrative remedies to the full extent possible, then filed in this Court when all other options were blocked by the Defendants due to retaliation for requesting accommodations. Plaintiffs have pled sufficient facts to support their claims of being denied constitutional rights, of being retaliated against, and of being subjected to discrimination.

39. Defendants have neither a legitimate nor compelling interest in exercising express and overt religious discrimination. Defendants' invocation of "undue hardship" defenses are plainly false pretexts attempting to cover for the Defendant's explicit religious discrimination.

40. The U.S. Supreme Court has ruled that suspension without pay is retaliatory discrimination. See Burlington Northern and Santa Fe Railway Company, 548 US 53 (2006) ("that White suffered retaliatory discrimination when she was reassigned to less desirable duties and suspended without pay"). Bias or hostility to a religious practice or accommodation cannot supply a defense.

***Plaintiff Jean has successfully pled deprivation of Constitutional rights and retaliation for requesting an exemption/accommodation from the COVID Vaccination***

41. Plaintiff Jean has pleaded facts stating a plausible action that Defendants have retaliated against her for her request for accommodation. She has successfully pled a Section 1983 deprivation.

42. In this case, for the reasons stated here, Defendant's policies imposed on Plaintiff Jean set forth a prima facie case of retaliation because the allegations viewed in a light most

favorable to the Plaintiff shows that Plaintiff was terminated because of her sincere religious beliefs. Lowman v. NVI LLC, 821 Fed. Appx. 29, 31 (2d Cir. 2020); see also Offor v. Mercy Med. Ctr., 167 F. Supp. 3d 414, 429 (E.D.N.Y. 2016). Specifically, Plaintiff has stated that Defendant's discriminatory imposition of the COVID Vaccine Mandate on employees and, at the same time, placing her fingerprints into the "Problem Code" has permanently scarred her career, and life. Defendants have failed to prove that their procedures applying the COVID Vaccine Mandate (CVM) and Plaintiff's termination were lawfully executed under prevailing policy and the Constitution.

43. The Supreme Court case the EEOC v. Abercrombie & Fitch Stores, Inc. 575 U.S. 768 (2015) concluded that "An employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions." Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872, 877 (1990).

44. The Defendant never offered any reasonable accommodation to the Plaintiff that would both satisfy the Plaintiff's sincere religious beliefs and the Defendants' concern for "a safe environment for in-person learning. The Constitution's protection against government regulation of religious belief is absolute; it is not subject to limitation or balancing against the interests of the government. Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 877; Sherbert v. Verner, 374 U.S. 402 (1963).

45. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith herein.". West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943).

46. A law is not neutral if it singles out particular religious conduct for adverse treatment, treats the same conduct as lawful when undertaken for secular reasons but unlawful when undertaken for religious reasons, applies uncalled for restrictions on religious conduct or "accomplishes . . . a 'religious gerrymander,' an impermissible attempt to target [certain individuals] and their religious practices."A law is not generally applicable if "in a selective manner [it] impose[s] burdens only on conduct motivated by religious belief," including by "fail[ing] to prohibit nonreligious conduct that endangers [its] interests in a similar or greater degree than . . . does" the prohibited conduct, id., or enables, expressly or de facto, "a system of individualized exemptions," as discussed in Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 884 (1990); see Church, 537. "Neutrality and general applicability are interrelated, . . .[and] failure to satisfy one requirement is a likely indication that the other has not been satisfied." Id, 531.

47. A law that disqualifies a religious person or organization from a right to compete for a public benefit—including a grant or contract—because of the person's religious character is neither neutral nor generally applicable. See Trinity Lutheran Church of Columbia, Inc. v. Comer, Director, Missouri Department of Natural Resources, 582 U.S. (slip opinion pages 9–11) (2017).

48. ***Plaintiff Comack has successfully pled retaliation and deprivation of Constitutional due process rights and medical necessity to obtain an exemption from the vaccine.***

49. Supreme Court precedent has evolved significantly since *Jacobson v. Massachusetts* (197 U.S. 11 (1905), a U.S. Supreme Court case that upheld the authority of states to enforce compulsory vaccination laws based on their police power during public health emergencies. Since Jacobson, the Supreme Court has consistently applied strict scrutiny

to medical exemption claims, clarifying that if a medical exemption policy is narrow enough that it might exclude even a few who might need it, it is unconstitutional on its face. See, e.g., Stenberg v. Carhart, 530 U.S. 914,

50. 937 (2000); Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320 (2006). The Court now also expressly recognizes a fundamental right to refuse medical intervention, even lifesaving medical intervention. This right was first explicitly recognized in Cruzan v. Director, Missouri Dept. of Health, 497 U.S. 261, 269 (1990), wherein the Court recognized a due process liberty interest in refusing unwanted medical treatment based on the doctrine of informed consent and the commonlaw rule that forced medication equals battery. In recognizing this right, the Supreme Court noted, "no right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person." Id. at 269.

51. In Health Freedom Def. Fund, Inc., v. Carvalho, No. 22-55908, 2024 WL 2873372 (9th Cir. June 7, 2024), the Ninth Circuit reinstated constitutional challenges to the Los Angeles Unified School District's Covid-19 vaccine mandate, overruling the district court's determination that there is a legitimate government interest in mandating a vaccine that cannot stop the spread of disease. The Ninth Circuit concluded that the police powers invoked in Jacobson do not apply to personal medical choices, which the government is not at liberty to infringe without strict scrutiny. It is well-established that the Fourteenth Amendment "forbids the government to infringe 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest. Washington v. Glucksberg, 521 U.S. 702, 721 (1997) (recognizing the right to refuse medical intervention as fundamental). Defendants

criteria for medical exemption policy does not meet this burden, as Defendants never made their standard clear. Even where a vaccine mandate is itself lawful, the Court's jurisprudence on medical exemptions should require strict scrutiny where a medical exemption is withheld so long as the plaintiff can assert a prima facie case that they are likely at risk of harm due to their underlying condition, as Plaintiff Comack did in this case.

52. It is absurd to force an employee to take a medically contraindicated vaccine, especially where the vaccine cannot stop transmission and is only for personal benefit. Moreover, many less restrictive alternatives existed, such as providing medical accommodation. Defendants did not show as a matter of law that they could not have afforded this accommodation. Indeed, the Jacobson Court itself specifically noted that even if based on the acknowledged police powers of a state, a public-health measure must always yield in case of conflict with any right which [the Constitution] gives or secures. Moreover, the Ninth Circuit's recent decision in Health Freedom Def. Fund v. Carvalho, 104 F.4th 715, 727 (9th Cir. 2024) recognized that Jacobson does not apply to vaccines that primarily benefit the recipient like COVID-19 vaccines. When intervention is not for the common good, the state's police powers do not govern.

53. Defendant's medical exemption policy, if it indeed exists at all, is patently unfair and violates principles of harm avoidance to require an employee to choose between her job and a vaccine which is contraindicated for her due to her underlying condition. Nor is it proportional or necessary to ask her to play Russian Roulette with her life, given the multiple carve outs and official recognition that the vaccine is only for personal protection.

*54.* To the extent that Defendant argues they merely conditioned employment on compliance, this argument fails. The government may not deny a benefit to a person on a basis that infringes her constitutionally protected interests. (Perry v. Sinderman, 408 U.S. 593, 597 (1972). The unconstitutional conditions doctrine vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up. Koontz v. St. Johns River Water Mgmt Dist., 570 U.S.595, 604 (2013).

## CONCLUSION

55. It is clear that the Defendant had knowledge of Plaintiffs' sincerely-held religious beliefs and medical necessity to remain unvaccinated, yet chose to ignore these beliefs and medical issues, denied their exemption requests, blocked their Appeals with erratic technological timelines, and declared them guilty of misconduct with a permanent problem code, an adverse employment action.

56. Defendant has blatantly ignored all the laws demanding a reasonable accommodation for Plaintiffs.. Defendant never offered any reasonable accommodation to the Plaintiff that would both satisfy the Plaintiff's sincere religious beliefs and the Defendant's concern for "a safe environment for in-person learning." *Ansonia Bd. ofEduc. v. Philbrook,* 479 U.S. 60, 68-69 (1986). It is well-known that the City has "Absent Teacher Reserves" (ATRs) ready and willing to step into a position to fill in for an absent teacher. Defendant already rents spaces throughout New York City for people who are reassigned or are ATRs. The process and substance of the rubber rooms has been created and paid for by the NYC DOE for more than 22 years.

57. The Defendants also offer remote teaching in almost all their schools. Defendants never offered a single document or factual evidence that showed any effort towards

accommodating Plaintiffs, and never gave any rational basis to deny their religious exemption requests.  The Department totally failed in this duty. All these actions are clearly, as is the implementation of the problem code on Plaintiffs fingerprints so that they cannot ever again work for Defendant.

**WHEREFORE**, Plaintiffs' demands for relief include recovery of monetary damages in backpay from the date of being removed from salary to the present; full reinstatement to Plaintiffs' prior titles and positions with all raises and benefits; their names and personal data removed from the Office of Personnel Investigations' ("OPI") Problem Code database; and/or they will each be given a §3020-a Arbitration Hearing to defend and support their keeping their jobs without getting vaccinated with accommodations for their requests for religious and medical accommodation.

Dated: October 13, 2025


/s/Jean Jean                    /s/Kathleen Comack
Jean Jean                           Kathleen Comack